

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-061-CV

IN THE INTEREST OF R.R., JR. AND
V.R., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

Mother and Father appeal from a judgment terminating their parental rights to R.R. and V.R. Mother asserts as her sole issue, "Does the Indian Child Welfare Act ["ICWA" or "the Act"] apply to this case?" Father raises two issues: in his first issue, he challenges the factual sufficiency of the evidence to support the finding that termination of his parental rights was in the best interest of R.R. and V.R., and in his second issue, he argues that the trial court erred by not granting a new trial in light of evidence that the ICWA may apply. We will overrule Father's first issue. Because, according to published guidelines

that we are to give great weight to, the trial court here had reason to know that Indian children were involved, specific statutory notices containing specific statutorily defined information were required to be sent to specific individuals. Although the Texas Department of Family and Protective Services ("TDFPS") sent out notices, those notices did not comply with the statutory requisites. Accordingly, we will abate this appeal and remand this case to the trial court so that proper notice may be provided to the proper individuals and so that, after such notice, the trial court may conduct a hearing and make a determination as to whether R.R. and V.R. are Indian children under the ICWA.

## II. THE INDIAN CHILD WELFARE ACT

### A. Purposes and Relevant Provisions of the Act

Congress enacted the ICWA in 1978. Indian Child Welfare Act of 1978, 25 U.S.C.A. §§ 1901–63 (2001). The federal legislation was passed in response to the "rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 1599–1600 (1989); *see also In re W.D.H.*, 43 S.W.3d 30, 34 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The ICWA applies

2

to all state child custody proceedings involving an Indian child when the court knows or has reason to know an Indian child is involved. 25 U.S.C.A. § 1912(a); *Doty-Jabbaar v. Dallas County Child Protective Servs.*, 19 S.W.3d 870, 874 (Tex. App.—Dallas 2000, pet. denied). And an Indian child is defined by the Act as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4).

The ICWA provides a variety of procedural and substantive protections in child custody proceedings involving an Indian child. It sets out minimum requirements with which a state court must comply before terminating parental rights in a case involving an Indian child. *See id.* § 1912; *Doty-Jabbaar*, 19 S.W.3d at 874. No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *See* 25 U.S.C.A. § 1912(f). Additionally, the tribe is entitled to notice of a custody proceeding involving an Indian child and has the right to intervene at any stage of the proceedings. *See id.* § 1912(a) (notice), § 1911(c) (intervention). But the

3

tribe's failure to intervene does not mean that the ICWA does not apply; the ICWA applies when an Indian child is involved regardless of the tribe's participation in the proceeding. *W.D.H.*, 43 S.W.3d at 34; *Doty-Jabbaar*, 19 S.W.3d at 874.

### B. Membership or Eligibility for Membership in a Tribe

Although the Act defines an Indian child as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe," the Act does not define what constitutes being a "member" or what constitutes being "eligible for membership." *See* 25 U.S.C.A. § 1903(4).

Case law makes it clear, however, that enrollment in a tribe or registration with a tribe is not the only way to establish membership. *See, e.g., In re H.D.*, 11 Kan. App. 2d 531, 535−36, 729 P.2d 1234, 1238 (Ct. App. 1986). Under the ICWA, enrollment is not a necessary condition of tribal membership. *Nelson v. Hunter*, 132 Or. App. 361, 364, 888 P.2d 124, 125−26 (Ct. App. 1995). "[M]embership may be established through proof of enrollment[;] enrollment is not the exclusive test of membership." *Id.*[1] "Enrollment is not always required

---

[1] The *Nelson* court noted that "Congress considered and rejected proposed language which would have restricted the application of the ICWA protections to only enrolled members of an Indian tribe." *Id.*, 888 P.2d at 126 n.4 (citing 1978 U.S.C.C.A.N. 7530, 7538−39, 7558−63).

4

in order to be a member of a tribe. Some tribes do not have written rolls. Others have rolls that list only persons that were members as of a certain date." *Id.*, 888 P.2d at 125; *accord In re Junious M.*, 144 Cal. App. 3d 786, 791, 193 Cal. Rptr. 40, 42–43 (Dist. Ct. App. 1983). Likewise, the ICWA contains no blood quantum requirement; rather, each tribe has its own criteria. *See* Thomas R. Myers & Jonathan J. Siebers, *ICWA: Myths and Mistaken Application*, 83 Mich. Bar. J. 12, 21 (2004).

The ICWA's failure to provide any statutory definition of the term "member of an Indian tribe" or of the term "eligible for membership" renders the ICWA ambiguous or unclear on exactly how membership or eligibility for membership is to be determined, especially in the absence of enrollment in or registration with a tribe. But following the enactment of the ICWA, the Department of the Interior issued guidelines for state courts in Indian child custody proceedings. *See* Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979) (hereinafter referred to as "Guidelines").[2] These Guidelines were not intended to have binding legislative effect. *See id.* But construction of a statute by the

---

[2] *See* Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings, *available at* http://www.nicwa.org/policy/regulations /icwa/ICWA_guidelines.pdf (last visited March 18, 2009).

executive department charged with its administration is entitled to great weight. *See* Tex. Gov't Code Ann. § 311.023(6) (Vernon 2005); *SWZ, Inc. v. Bd. of Adjustment of City of Fort Worth*, 985 S.W.2d 268, 270 (Tex. App.—Fort Worth 1999, pet. denied); *see also Stanford v. Butler*, 142 Tex. 692, 700, 181 S.W.2d 269, 273 (1944) (observing that courts will ordinarily adopt and uphold a construction placed upon a statute by a department charged with its administration if the statute is ambiguous or uncertain, and the construction is reasonable); *Tex. Ass'n of Long Distance Tel. Cos. v. Pub. Util. Comm'n of Tex.*, 798 S.W.2d 875, 884 (Tex. App.—Austin 1990, writ denied) (same). Following courts from other jurisdictions, at least one Texas court has looked to the Guidelines in construing an undefined term in the Act. *See Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 163–64 (Tex. App.—Houston [14th Dist.] 1995, orig. proceeding) (utilizing ICWA Guidelines to construe undefined term—"good cause"—in ICWA); *see also Junious M.*, 144 Cal. App. 3d at 793–94, 193 Cal. Rptr. at 43–44 (utilizing Guidelines to construe undefined term "member" in ICWA); *H.D.*, 11 Kan. App. 2d at 533–36, 729 P.2d at 1237–39 (utilizing Guidelines to determine when and under what circumstances tribal notice and opportunity to be heard exist).

Thus, we next examine the Guidelines for instruction on how membership or eligibility for membership in a tribe is to be determined absent enrollment or

6

registration in a tribe. The Guidelines begin by recognizing that there is a preference for keeping Indian children with their families or with other Indian families and for deferring to tribal judgment on matters concerning custody of tribal children. BIA Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67,586. The Guidelines state that "[p]roceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences." *Id*. The Act and all regulations, guidelines, and state statutes relating to it "shall be liberally construed in favor of a result that is consistent with these preferences. Any ambiguities in any of such statutes, regulations, rules, or guidelines shall be resolved in favor of the result that is most consistent with these preferences." *Id*.

The Guidelines provide specific instructions on how to determine the status of an alleged Indian child:

> When a state court has reason to believe a child involved in a child custody proceeding is an Indian, *the court shall* seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe.
>
> . . . .
>
> The determination by a tribe that a child is or is not a member of that tribe, is or is not eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive.

7

. . . .

Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include . . . (i) Any party to the case . . . informs the court that the child is an Indian child. . . . (ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

. . . .

In any involuntary child custody proceeding, *the state court shall make inquiries* to determine if the child involved is a member of an Indian tribe or if a parent of the child is a member of an Indian tribe and the child is eligible for membership in an Indian tribe.

*Id.* at 67,586 (emphasis added). The commentary to this section of the Guidelines, which is titled "B.1. Determination That Child Is an Indian," instructs that "[t]his guideline makes clear that the best source of information on whether a particular child is Indian is the tribe itself. It is the tribe's prerogative to determine membership criteria." *Id*.; *see In re Adoption of Riffle*, 273 Mont. 237, 242, 902 P.2d 542, 545 (1995) (recognizing that the tribe is the ultimate authority on eligibility for tribal membership and the tribe's determination is conclusive); *see also Junious M*., 144 Cal. App. 3d at 788, 193 Cal. Rptr. at 40 (same). The commentary further provides that "[a]lthough tribal verification is preferred, a court may want to seek verification from the BIA [Bureau of

Indian Affairs] in certain circumstances." BIA Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67,586.

The commentary to section B.1. of the Guidelines also indicates that it is the trial court's and the petitioner's burden to make inquiry sufficient to affirmatively determine whether the child is an Indian or not. The commentary explains,

> The guidelines also list several circumstances which *shall trigger an inquiry by the court and petitioners* to determine whether a child is an Indian for purposes of this Act. This listing is not intended to be complete, but it does list the most common circumstances giving rise to a reasonable belief that a child may be an Indian.

*Id.* (emphasis added).

Thus, according to the Guidelines, membership is to be determined by the tribe, and the trial court and the petitioner (as evidenced by the Guidelines' use of mandatory "shall" language in three places) are to make inquiries to resolve the issue of whether the child is an Indian when the trial court has reason to believe that the child is an Indian because any party says he is or because a state-licensed agency involved in child protection services has discovered information which suggests that the child is an Indian child. *See id.*

### C. "INQUIRY" AND NOTICE

The exact inquiry that the trial court—or here TDFPS on behalf of the trial court—is required to make is set forth in section 23.11 of volume 25 of the

9

Code of Federal Regulations.  25 C.F.R. § 23.11 (2008).  That section is titled,

"Notice of Involuntary Child Custody Proceedings and Payment for Appointed

Counsel in State Courts."  *Id.*  It provides, in pertinent part:

> (a) In any involuntary proceeding in a state court where the court knows or has reason to know that an Indian child is involved, and where the identity and location of the child's Indian parents or custodians or tribe is known, the party seeking . . . termination of parental rights to [] an Indian child shall directly notify the Indian parents . . . and the child's tribe by certified mail with return receipt requested, of the pending proceedings and of their right of intervention.  Notice shall include requisite information identified at paragraphs (d)(1) through (4) and (e)(1) through (6) of this section, consistent with the confidentiality requirement in paragraph (e)(7) of this section.  Copies of these notices shall be sent to the Secretary and the appropriate Area Director listed in paragraphs (c)(1) through (12) of this section.
>
> (b) If the identity or location of the Indian parents, Indian custodians or the child's tribe cannot be determined, notice of the pendency of any involuntary child custody proceeding involving an Indian child in a state court shall be sent by certified mail with return receipt requested to the appropriate Area Director listed in paragraphs (c)(1) through (12) of this section.  In order to establish tribal identity, it is necessary to provide as much information as is known on the Indian child's direct lineal ancestors including, but not limited to, the information delineated at paragraph (d)(1) through (4) of this section.

*Id.*  Thus, under either of these subsections—that is whether the identity and

location of the child's tribe is known or unknown—the notice is to include the

information delineated in paragraph (d)(1)–(4).  *Id.*

10

Section 23.11, paragraph (d)(1) through (4) requires that the notice include the name of the Indian child, the child's birthdate and birthplace, the name of the Indian tribe(s) in which the child is enrolled or may be eligible for enrollment, "all names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents . . . including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers and/or other identifying information." *Id.* § 23.11(d)(1)–(4). Likewise, whether the identity and location of the child's tribe is known or unknown, notice is required to be sent to the "appropriate Area Director." *Id.* § 23.11(a), (b). For proceedings in Texas (except for proceedings in the Texas counties of El Paso and Hudspeth), the notice is to be sent to "Anadarko Area Director, Bureau of Indian Affairs, P.O. Box 368, Anadarko, Oklahoma 73005." *Id.* § 23.11(c)(4). The notice is to include "the location, mailing address, and telephone number of the court and all parties notified pursuant to this section." *Id.* § 23.11(e)(4).

A copy of the petition, complaint, or other document by which the proceeding was initiated is to be attached to the notice. *Id.* § 23.11(d)(4). The notice is also required to include other criteria, all of which are set forth in the statute. *See id.* § 23.11.

11

When a copy of the notice is served on the Secretary of the Interior, his designee

> shall make reasonable documented efforts to locate and notify the child's tribe . . . . The Secretary or his/her designee shall have 15 days, after receipt of the notice from the persons initiating the proceedings, to notify the child's tribe . . . . If within the 15-day time period the Secretary or his/her designee is unable to verify that the child meets the criteria of an Indian child as defined in 25 U.S.C. 1903, . . . the Secretary or his/her designee shall so inform the court prior to initiation of the proceedings and state how much more time, if any, will be needed to complete the search.

*See id.* § 23.11(f).

### D. THE PRESENT FACTS

In the present case, the Assistant District Attorney who prosecuted the termination suit sent out four notices; two concerning R.R. were filed with the court on September 19, 2007, and two naming both R.R. and V.R. as the children subject to the termination suit were filed during trial on February 13, 2008. Two of the four notices were labeled as directed to "the Kiowa Indian Nation," and two were labeled as directed to "The Secretary of the United States Department of the Interior." But all four notices were mailed only to Mr. David Anderson, Assistant Secretary For Indian Affairs, and to Mother, Father, and the court-appointed attorney for R.R. and V.R. None of the notices were mailed to the Area Director, and none of the notices were mailed by certified mail or by registered mail.

12

All four of the notices disclosed that a parental termination suit had been filed concerning R.R. (or R.R. and V.R.) and stated that Mother was allegedly an Indian as defined in the ICWA and that R.R. (or R.R. and V.R.) were allegedly Indian children under the ICWA. The notices directed to the Kiowa Nation stated that "[t]he child [R.R. (or R.R. and V.R.)] who is the subject of this proceeding is believed to be a member of or eligible for membership in a federally recognized Indian tribe." The notices directed to the Secretary of the United States Department of Interior—but not the notices directed to the Kiowa Nation—stated that "Maternal Grandmother MINNIE MARIE AUNIQUE (aka AUNQUE, AUNEQUE), alleges to be a member of the KIOWA INDIAN NATION, in OKLAHOMA."

The termination suit concerning R.R. and V.R. was called to trial on February 5, 2008. At the conclusion of testimony on February 5, the trial court indicated that the trial would be resumed and completed on February 13, 2008. On February 13, 2008, at 9:30 a.m., the trial court resumed the termination trial. On February 13, 2008 at 11:58 a.m., in addition to filing two of the four notices mentioned above, the Assistant District Attorney filed a document that

appears to be a single-page form apparently filled out by the Kiowa Tribe of Oklahoma Indian Child Welfare program.[3]

The form is addressed to "Enrollment Department" and is from "Indian Child Welfare Program," specifically S. Ahtone. The subject referenced in the memo-type form is "Minors certificate of degree of Indian blood (C.D.I.B.) &/or statement of eligibility for enrollment." The form states that "[t]he Child Welfare Program is requesting the following: Child(ren) and Family Tribal Background Report." The form specifically names R.R., V.R., and Mother. At the bottom of the form, in the "Comments" section under the heading "Eligible for Enrollment: ( )YES    ( ) NO," the enrollment officer has written, "[N]eed more info, probably under blood quantum," above his/her illegible signature. At the bottom of the request, in the same handwriting as the children's and mother's names filled in on the form, is "Maternal grandmother Minnie Marie Anque." The enrollment officer wrote under this comment, "K00416 ½ Kiowa," apparently indicating that Mother's mother, Minnie Marie Anque, was one-half Kiowa.

---

[3] We would have liked to attach a copy of this form as Appendix A to our opinion, but to do so would have revealed R.R.'s, V.R.'s, and Mother's full names.

The trial court did not apply the ICWA at trial.[4]  Mother filed a motion for new trial asserting that the ICWA applied and testified at the hearing on the motion concerning her alleged Kiowa ancestry.  At the motion for new trial hearing, Mother testified, in pertinent part, as follows:

Q.  And is your mother Minnie Marie Anqe [sic]?

A.  Yes, sir.

Q.  And was she a member of the Kiowa Indian tribe?

A.  Yes, sir.

Q.  A registered member?

A.  Yes.

Q.  And do you know whether you're a registered member of the Kiowa Indian tribe?

A.  I'm supposedly a member of it because I'm Indian, but I don't know nothing about it.  Yes, sir.

Q.  Do you know whether the children, whether they would be eligible members?

---

[4] We have thoroughly reviewed the reporter's record from the trial.  In addition, we performed a word search on the ASCII disc filed by the court reporter as well as a word search in the hard copy of the word index provided by the court reporter.  Nowhere in the record during trial does Mother testify that she is not a member of the Kiowa Nation or that R.R. and V.R. are not members.  Her testimony on this issue at trial is minimal; she testifies that she is looking into getting Indian Welfare benefits for the children but is having difficulty obtaining information about her mother, who was a registered member of the Kiowa Nation, because her mother died when she was two years old.

15

A. Yes, sir, because me and my family is, they should be at least a little bit. Less than half. Probably about half.

. . . .

Q. [Mother], you said you're an eligible tribal member, is that correct?

A. Yes, ma'am.

On cross-examination Mother testified:

Q. Do you remember coming to this court during the trial and telling the judge and everyone in this courtroom that your mother, who is the maternal grandmother to your children, was a member of the Kiowa Indian tribe?

A. Yes.

Q. And do you remember when I asked you if you were a member of the Indian tribe? Do you remember that question?

A. Yes, ma'am.

Q. And do you recall saying no, I am not a member? Do you recall saying that?

A. No, ma'am, I don't.

Q. Do you recall saying that you knew that was something you needed to look into as to the membership for the tribe?

A. Yes, ma'am.

Q. So you don't know if you're a member; you just know that you're an eligible tribal member because your mother was a member?

A. No. What I had supposedly known - -

16

[THE COURT]: I'm sorry. Would you say that again? I couldn't understand you.

A. What I supposedly found out, too, is that I have an aunt down here. She knows I'm eligible for being an Indian, too, because that's my mom's sister, and I just found out that she was here in Fort Worth.

Q. Is it true that you're eligible to be a tribal member of the Kiowa Nation?

A. Yes, ma'am.

Q. Is that true?

A. Yes, ma'am.

. . . .

Q. Have you - - [Mother], have you ever registered with the Kiowa Nation? Yes or No.

A. Yes, I have.

Q. When did you do that?

A. When I was born. They did that when I was born. I'm Indian.

Q. Okay. But you told this court that you were not a tribal member.

A. No, ma'am, I did not say that. You guys misunderstood that. I had told you I'm eligible and I'm a member of it, because my mom - - on my mom's side of the family is nothing but Indian.

Q. Okay.

A. And I had told the judge that, too, and everybody that was in the courtroom that day.

17

Q. Okay. Your mother is a tribal member of the Kiowa Nation, is that correct?

A. Yes.

Q. Is she alive or deceased?

A. She's deceased.

Q. Okay. And you think you're a member - - today, you think you're a member because someone registered you when you were a baby, is that right?

A. Yes. Because I know, because they have to do that when you're Indian. When they know that your family on one side of the family is an Indian that's already registered, they have to register the kids.

The trial court denied Mother's and Father's motions for new trial but found that Mother's and Father's appeals of the termination judgment were not frivolous. Mother and Father perfected this appeal.

### E. Application of the Law to the Present Facts

Mother, in her first issue, claims that the ICWA applies here. Father, in his second issue, claims that the trial court erred by not granting a new trial in light of the evidence that the ICWA may apply. TDFPS argues that the ICWA does not apply; TDFPS's brief focuses on the issue of whether the trial court had reason to believe that R.R. and V.R. were Indian children and argues that it did not.

18

TDFPS relies on five main cases for the proposition that the trial court here had no reason to believe that the children were Indian children. We have reviewed each of these cases and the facts in all of them are distinguishable from the present facts. *See In re R.M.W.*, 188 S.W.3d 831, 832 (Tex. App.—Texarkana 2006, no pet.) (failing to mention, recognize, or apply Guidelines); *see also In re Johanson*, 156 Mich. App. 608, 613–14, 402 N.W.2d 13, 16 (Ct. App. 1986) (affirming direct appeal of termination order when mother was not member of tribe prior to order and no evidence existed in record that trial court had any reason to believe Indian children were involved); *In re Guardianship of J.O.*, 327 N.J. Super. 304, 316–17, 743 A.2d 341, 347 (Super. Ct. App. Div.) (holding attorney's reference to possibility of Indian ancestry during status conference insufficient to provide trial court with reason to believe children were Indian children when parties were provided with ample opportunity to pursue the issue but did not), *cert*. *denied*, 165 N.J. 492 (2000) ; *In re A.L.*, 2001 ND 59, ¶ 12, 623 N.W.2d 418, 422 (holding that when mother offered no evidence to suggest the children were Indian children, but relied upon her counsel's statements, trial court had no reason to believe children were Indian children); *In re Arianna R.G.*, 2003 WI App 11, ¶ 21, 259 Wis. 2d 563, ¶ 21, 657 N.W.2d 363, ¶ 21 (holding trial court did not have

19

reason to believe children were Indian children based solely on statements of attorney).

We decline to follow *In re R.M.W.* because neither the trial court nor the appellate court in *R.M.W.* mentioned or gave proper weight to the Guidelines. 188 S.W.3d at 832. Here, unlike in the four other cases relied upon by TDFPS, in which the only evidence of the children's possible Indian status came from arguments of counsel, there is evidence from the tribe that the children's maternal grandmother was an enrolled member and an indication that the tribe needed more information to determine whether R.R. and V.R. were members or were eligible for membership. And here, unlike those four cases, the party seeking termination did give some type of notice—although for the reasons discussed below it was defective. And finally, here, according to the Guidelines, the trial court did have reason to believe that R.R. and V.R. were Indian children.

According to the Guidelines, the trial court here had reason to believe that R.R. and V.R. are Indian children because a public or state-licensed agency involved in child protection services or family support—TDFPS—discovered information—that the children's maternal grandmother was alleged to be a member of the Kiowa Indian Nation—that suggests that R.R. and V.R. are Indian children. BIA Guidelines for State Courts; Indian Child Custody

20

Proceedings, 44 Fed. Reg. at 67,586. Once the state court had reason to believe that R.R. and V.R. were Indian children, the notice provisions of the ICWA were triggered. *Id*. (providing that when a state court has reason to believe a child involved in a child custody proceeding is an Indian, *the court shall* seek verification of the child's status from either the BIA or the child's tribe). The inquiry is to contain specific information, presumably to enable the tribe to make a determination on whether the child is, in fact, a member of the tribe or is eligible for membership in the tribe. *See* 25 C.F.R. § 23.11(d)(1)–(4).

The notices sent in this case were deficient in several respects. They were not sent certified mail, return receipt requested. *See* 25 U.S.C.A. § 1912(a) (requiring notice under the ICWA be provided by certified mail, return receipt requested). They did not contain R.R.'s and V.R.'s ages, birthdates, place of birth, Mother's current and former addresses, Mother's married and maiden name, or Mother's birthdate and place of birth. *See* 25 C.F.R. § 23.11(d)(1)–(3) (setting forth requirements to be included in notice and including these items). Additionally, the notices were not mailed to the appropriate area director, "Anadarko Area Director, Bureau of Indian Affairs, P.O. Box 368, Anadarko, Oklahoma 73005." *Id.* (requiring mailing to Area Director). None of the notices included the telephone number for Mother or Father. *Id*. § 23.11(e)(4) (requiring phone numbers be provided).

21

Substantial compliance with these notice provisions will not suffice. *See, e.g., In re I.E.M.*, 233 Mich. App. 438, 448–49, 592 N.W.2d 751, 757 (Ct. App. 1999) (holding notice did not comply with the ICWA when not sent by certified mail, return receipt requested, and holding telephone calls did not satisfy notice requirement). Instead, proper notice in compliance with the ICWA and the statutory notice provisions is a prerequisite to a state court's determination of whether to apply the ICWA. *See, e.g.*, *In re C.H.*, 510 N.W.2d 119, 124 (S.D. 1993) (holding notice provided to Choctaw Nation of Oklahoma not in compliance with the ICWA because not mailed by certified mail, return receipt requested as required by the Act). Compliance with all of the ICWA notice provisions is required to promote and to maintain stability in the placement of children; it is preferable to err on the side of giving notice and examining thoroughly whether the child is an Indian. *I.E.M.*, 233 Mich. App. at 447, 592 N.W.2d at 757 (quoting *In re M.C.P.*, 153 Vt. 275, 289, 571 A.2d 627, 634–35 (1989)); *see also In re J.W.*, 498 N.W.2d 417, 419 (Iowa Ct. App. 1993) (recognizing that "it would be irresponsible for this court not to assure the [notice] provisions of the Act were followed" based on "a serious risk subsequent proceedings may be brought for invalidation of the termination order under section 1914"), *disapproved on other grounds by In re N.N.E.*, 752 N.W.2d 1 (Iowa 2008).

22

Based on the incomplete information provided in the notices here, the Kiowa Indian Nation apparently was unable to verify whether R.R. and V.R. were members of the tribe or eligible for membership in the tribe. Instead, the tribe sent back a document indicating that the children's grandmother was a registered member of the tribe by noting, "Maternal grandmother Minnie Marie Anque . . . K00416 ½ Kiowa," and requesting more information to determine whether R.R. and V.R. were members or were eligible for membership. The Assistant District Attorney conceded that the tribe had requested additional information, stating, "I believe it states they need more information." Yet, the record does not reflect that any additional information was provided to the tribe, that Mother and Father were provided a copy of the tribe's response, or that the tribe was provided Mother's or Father's phone number to contact them directly.

And although the Secretary of the Interior or his designee was served, no copy of a notice sent by the Secretary of the Interior to the Kiowa Nation was filed with the trial court. *See* 25 C.F.R. § 23.11(f) (requiring the Secretary to send a copy of any notice provided to the tribe to the court). Additionally, the Secretary did not inform the trial court here prior to the initiation of the proceedings that he or his designee was unable to verify that R.R. and V.R. meet the criteria of Indian children. *See id.*

23

A violation of the ICWA notice provisions may be cause for invalidation of the termination proceedings at some later, distant point in time. *See* 25 U.S.C.A. § 1914 (providing that "[a]ny Indian child who is the subject of any action for . . . termination of parental rights under State law, any parent . . . from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title"); *see also W.D.H.*, 43 S.W.3d at 38−39 (recognizing parent of Indian child has standing to challenge adequacy of notice even though tribe declined to join suit). Consequently, because the termination proceeding here will likely result ultimately in the adoption of young R.R. and V.R., strict compliance with the notice provisions of the ICWA and the regulations implementing it in the Code of Federal Regulations is especially important, or "the State could offer prospective adoptive parents no assurance this termination and a subsequent adoption would not be invalidated." *See J.W.*, 498 N.W.2d at 419−22 (recognizing that notice provisions of the ICWA are to be strictly construed and reversing order terminating parental rights because of inadequate notice and remanding for new hearing after proper notice).

Whether the trial court correctly applied the ICWA is a question of law. *See W.D.H.*, 43 S.W.3d at 33; *see also I.E.M.*, 233 Mich. App. at 443, 592

24

N.W.2d at 755 (holding that "[w]hether the probate court failed to satisfy a notice obligation imposed by the ICWA involves a legal question of statutory interpretation that we review de novo"). Here, because under the Guidelines the trial court had reason to know that R.R. and V.R. were Indian children, the notice provisions of the ICWA were triggered. *See* BIA Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67,586 (providing that "[w]hen a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status"); *see also* 25 C.F.R. § 23.11(a)–(f) (setting forth requisites of notices given under the ICWA). Because the predicate of proper notice under the ICWA was not satisfied here, the trial court could not resolve the issue of whether R.R. and V.R. were Indian children without leaving its termination decree open to subsequent challenge and invalidation by Mother, Father, the tribe, R.R., or V.R. *See, e.g.*, 25 U.S.C.A. § 1914 (authorizing "any Indian child who is the subject of any action for . . . termination of parental rights under State law, any parent . . . from whose custody such child was removed, and the Indian child's tribe [to] petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title"); *Junious M*., 144 Cal. App. 3d at 791, 193 Cal. Rptr. at 42 (explaining that violation of the ICWA's notice provisions may be

25

cause for invalidation of the proceedings). Once proper notice is given in compliance with the dictates of the ICWA, however, if the tribe fails to respond or intervenes but fails to determine the child's membership or eligibility for membership in the tribe, then the burden shifts to the parties to show that the ICWA applies. *See I.E.M.*, 233 Mich. App. at 449, 592 N.W.2d at 757 (recognizing that neither Father nor tribe had responsibility to establish applicability of the ICWA absent proper notice as dictated by the ICWA); *In re Baby Boy Doe*, 123 Idaho 464, 470, 849 P.2d 925, 931 (explaining that, if, after proper notice, the state court does not receive a conclusive determination from the tribe or the BIA regarding a child's eligibility for tribal membership, the trial court must make its own determination, and the burden of producing the necessary evidence on this issue is on the party asserting the applicability of the ICWA), *cert. denied*, 510 U.S. 860 (1993).

Because, in the absence of proper notice any determination of whether the children were Indian children was premature, we sustain the portion of Mother's first issue claiming that the trial court erred in its determination of whether the ICWA applied. We likewise sustain the portion of Father's second issue complaining that the trial court erred by not granting a new trial on the issue of whether R.R. and V.R. were Indian children. We need not address the

26

balance of Mother's first issue or of Father's second issue. *See* Tex. R. App. P. 47.1.

### F. PROPER REMEDY

When an appellate court finds a violation of the ICWA notice provisions, reversal is not necessarily warranted; instead, a court may remand the case to the trial court so that proper notice may be provided. *See* Tex. R. App. P. 44.4. The appellate court will conditionally affirm the termination order in the event that, on remand, after proper notice the children are determined to not be Indian children. *See, e.g.*, *Junious M.*, 144 Cal. App. 3d at 788, 193 Cal. Rptr. at 40 (indicating that the ICWA notice error required a "qualified reversal"); *In re R.E.K.F.*, 698 N.W.2d 147, 150 (Iowa 2005) (and cases cited therein); *C.H.*, 510 N.W.2d at 124 (holding that, when there is uncertainty as to whether the ICWA applies and there is a notice defect, proper remedy is to remand for proper notice and determination of whether children are Indian children).

We will follow these courts and utilize that procedure here. We will abate this appeal and remand this case to the trial court. Proper notice that complies with the statutory notice requisites shall be provided, and then the trial court shall conduct a hearing to determine whether R.R. and V.R. are Indian children under the ICWA. *See* Tex. R. App. P. 44.4 (providing that appellate court shall

27

not reverse or affirm judgment if trial court can correct erroneous failure to act, and authorizing appellate court to direct trial court to correct erroneous failure to act and to then proceed as if erroneous failure to act had not occurred). After we receive the supplemental records generated by the hearing in the trial court—as set forth in our abatement order issued concurrently with this opinion—this appeal will be reinstated. If, after proper notice and a hearing, the trial court has determined that R.R. and V.R. are not Indian children, then we will issue a judgment affirming the trial court's termination judgment. *See* Tex. R. App. P. 43.2(a). If, after notice and hearing, the trial court determines that R.R. and V.R. are Indian children, then this court shall issue a judgment reversing the trial court's termination judgment, and the trial court shall conduct a new trial applying the ICWA. *See* Tex. R. App. P. 43.2(d).

### III. FACTUAL SUFFICIENCY TO SUPPORT TRIAL COURT'S FINDINGS THAT TERMINATION OF FATHER'S PARENTAL RIGHTS IS IN R.R'S AND V.R.'S BEST INTERESTS

In his first issue, Father argues that the evidence is factually insufficient to support the finding that termination of his parental rights is in the best interest of the children.

#### A. Facts Pertinent to Best Interest Analysis

#### 1. Father and Mother's Violent Relationship

28

Father and Mother met at the Presbyterian Night Shelter and started living together approximately one year later. They have been in an off-and-on relationship for approximately four years. Mother testified that she has been physically assaulted by Father five or six times since they have been together and that they both have anger management issues. Mother said that Father hit her for the first time when she was four or five months' pregnant with R.R.

## 2. Police and CPS Involvement

### a. July 2006

Jeannie Maxey, a CPS investigator, testified that she received a referral on July 14, 2006, two days after R.R.'s birth. The referral stated that there was domestic violence, a history of drug use by the parents, and financial instability.

Maxey went to the family's residence to interview the parents and noted that the residence was clean and appropriate. At first, Mother said that she and Father had only argued, but later Mother admitted that Father had hit her before R.R. was born. Mother also admitted that she had been to a domestic violence shelter. Mother told Maxey that she had used methamphetamine in

29

the past but had been clean for a few years[5] and that Father had used crack and had been drug-free for one to two years.

When Maxey spoke with Father, he said that he had a history of using crack and marijuana but had been clean for six months. Father admitted that he had a criminal history that included injury to a child.

Maxey testified that she did not remove R.R. at that time. Maxey, however, ruled the case as "reason to believe for neglectful supervision" because the parents were leaving R.R. with Father's mother, who had been diagnosed with schizophrenia and was unstable. Maxey also opened a case for family-based social services and recommended parenting classes and domestic violence counseling for Mother and Father.

### b. August 2006

In response to an allegation that Mother was spanking R.R., Maxey again visited Mother and Father's residence on August 17, 2006. While Maxey was there, she witnessed an argument as Mother, Father, and Father's mother disputed whether Mother or Father had struck the first blow during a previous domestic violence incident. Mother told Maxey that Father would be going to jail for a charge of injury to a family member and that produced concern over

---

[5] Mother's drug tests were negative during July 2006.

the family's financial future.[6]  Mother and Father both told Maxey that neither

of them had spanked R.R.[7]

### c.  September 2006

Maxey received a second referral that Mother was spanking R.R. and that

Mother was still leaving him with Father's mother.  Maxey testified that this

referral was "Ruled Out," meaning that there was no evidence to suggest that

Mother was spanking R.R.  Mother, moreover, said that she would not leave

R.R. with Father's mother again because she understood that Father's mother

was not an appropriate caretaker for R.R.

### d.  November 2006

Officer Billy Byers with the Fort Worth Police Department testified that he

went to Father and Mother's residence on November 8, 2006, in response to

a domestic disturbance call.  When Officer Byers arrived, he noted that Father

was intoxicated.  Officer Byers testified that the "bedrooms weren't liveable"

and that one of the bedrooms "had a bunch of dogs in it."  He further testified

that

---

[6] Maxey testified that while she had the case, Father did go to jail and that a case for family-based safety services was opened.

[7] Maxey testified that there was no allegation that Father had ever spanked R.R.

the baby was crying the entire time we were there. They had not once checked on that child until I asked them to because the baby was crying. And the baby was laying in that little cushion chair and they were just constantly arguing, yelling back and forth, cursing at each other. And this was all three of them. They were all screaming at each other, as well as the police that had responded out there.

[Mother's] action with taking the child outside the house with the cold condition and giving the baby to her obviously intoxicat[ed] husband and throwing, in fact -- or his words, throwing the baby at him at the store.

It's very unsafe for that child to be in. I'm not -- I don't recall what the baby's age was, but was only a couple of months old. Obviously, shouldn't have been out in that environment and should be looked after.

Bethany Houser, who works for CPS, testified that she received a referral on November 8, 2006. Houser said that the police had been called to the home twice on November 7 for domestic violence and were concerned about the condition of the home, the state of both parents, and R.R.'s safety and well-being in the home.

When Houser arrived, Father appeared to be intoxicated. Mother admitted that she had used drugs a couple of weeks before the night in question. Houser also saw that Father's mother lived with the family and knew that she had significant mental health issues.

Houser noted that there was debris, trash, clutter, and old bottles of spoiled formula throughout the residence; that there were plates and pans with old food on them on the floor; that there was dog feces primarily in the baby's

32

room; and that there were many holes in the walls, doors were off hinges, and broken framing existed around doors. Even though R.R. did not have any marks on him and revealed no signs of neglect other than a slight rash, Houser decided that it was in the best interest to remove R.R. on that date because she knew that there had been prior CPS cases involving Father and Mother.

After R.R. was removed, CPS asked Father to take a drug test. In a drug test dated November 15, 2006, Father tested positive for opiates.

### e. January 2007

Officer Jesus Alaniz with the Fort Worth Police Department testified that a concerned citizen reported on January 6, 2007, that a domestic disturbance was occurring in front of a Fiesta grocery store. Mother said that she had pushed Father, and Father said that Mother had hit him in the head. Mother received a citation for the incident.

33

### f.  May 2007[8]

Officer Byers testified that he responded to another domestic violence call at the residence in May 2007.  On that occasion, Mother had gotten into a physical fight with Father's mother, who hit Mother while she was pregnant with V.R.  When police arrived, Father's mother made threats of killing Mother and the police.  Officer Byers testified that Father's mother told them that she was schizophrenic and was on several medications for psychiatric problems, which he knew from previous dealings with her.  Father's mother also told them that there were people in the attic and people under the stairs that were coming to get her.  He felt that she had severe "issues with her coherency" and that it was "very unsafe for anybody to be around."  Officer Byers further testified that he had been to the residence three or four times within the past year and that it was an unstable environment for a child.

---

[8] The record is unclear regarding this date.  Initially, the attorney for TDFPS questioned Officer Byers about November 12, 2007, but referred to it as "the day after you were out there in November."  However, several questions later, the attorney for TDFPS questioned Officer Byers whether the environment observed in "May of '07" was different from the one he had observed in "November of '06."  Therefore, we use the May 2007 date because it appears more appropriate in the context.

### g. June 2007

Officer Michael Sones with the Fort Worth Police Department testified that he spoke with Mother in June 2007 and that she said she had been in a domestic assault while she was pregnant with V.R. Mother testified that Father had been drinking and that he had dragged her out of the house, pushed her, and hit her four times.

Officer Sones placed Father in the patrol car, and Father kicked out the back window of the patrol car. Father was charged with criminal mischief and assault bodily injury to a family member. Officer Sones testified that Father's lack of self-control is dangerous for a child and that the parties had a history of domestic violence.

### h. October 2007

Due to safety issues regarding children being in a home where domestic violence had occurred and was ongoing, CPS removed V.R. at birth. CPS placed V.R. with the same foster family that was keeping her brother R.R.

### i. December 2007

Officer Dean Meza responded to a call at the Presbyterian Night Shelter on December 25, 2007. Father had reported that Mother, whom he described as his fiancée, had assaulted him. Mother went to jail for the assault. Officer

Meza testified that, according to Father, both Father and Mother were living at the shelter.

### 3. Father's Convictions and Bad Acts

Father admitted that he had been convicted of and served time in the penitentiary for the offense of bodily injury to a child that occurred on or about April 20, 1997. Father also admitted that he had been convicted of robbery causing bodily injury and that prior to R.R.'s birth, he had been convicted of DWI.

Father testified that he was convicted of assault bodily injury to a family member (Mother) that occurred on or about February 8, 2006, while Mother was pregnant with R.R. Father explained that he had hit Mother in the face because he was mad and intoxicated.

Father discussed the facts underlying his June 2007 criminal mischief and assault bodily injury to a family member (Mother) convictions. Father admitted that he had been drinking that night and that Mother was pregnant with V.R. and added that Mother had assaulted him several times.

Father testified that on Christmas Day 2007, he was living with his uncle and that he went to visit Mother at the Presbyterian Night Shelter. Father said that Mother had assaulted him. Father admitted that he had pushed her back and stated that she had hit him once in the head and several times on the side

36

of the head.  Father called the police at that point and again two hours later when Mother pushed him again.

### 4.  The Service Plan and Father's Compliance Therewith

### a.  From CPS's Standpoint

April Cumberbatch, who works with CPS, testified that she explained the service plans to both Mother and Father.  Cumberbatch said that their service plans included a psychological evaluation, domestic violence counseling, a mental health assessment, and anger management.

Although Father signed his service plan, Cumberbatch testified that Father had not completed any of the services on his plan as of July 2007.  With regard to Father's visitations, Cumberbatch testified that Father was appropriate during the visits and seemed to have a good rapport with R.R.; however, Father's visits were inconsistent because he was in jail for physically assaulting Mother while she was pregnant.

Elizabeth Bowlen, the ongoing CPS caseworker who took over the case after Cumberbatch took a different job, testified that she had given Father bus passes to use to attend his classes and visits but that he had given them to a friend and was therefore not using them properly.  Bowlen said that Father did not make an appointment for his psychological examination until November or

37

December 2007, at which time the office did not have an opening until January; the office then stopped performing psychological evaluations.

Bowlen said that Father completed some services on his plan: parenting classes, anger management classes, a substance abuse assessment, CATS classes, and individual counseling. Bowlen testified that, despite Father's completion of these classes, she has not seen Father demonstrate what he has learned, though she admitted that there had been no domestic violence incidents in the one month since Father had completed the anger management classes.[9] Bowlen also testified that Mother and Father's counselor said that he did not feel that they would be capable of parenting children at this time and that he did not have positive things to say about Mother and Father's progress.

Bowlen testified that even if Father did not marry Mother, he could not provide either of his children with a safe and stable home as of the time of the termination trial. Bowlen explained that the case had been ongoing for fifteen months and that Father had not been able to establish a safe environment for the children to live in; the one house that he had paid rent on was deemed unsafe for the children to live in, and there was some testimony that the family had lived in a tent on Father's uncle's property at one point. Bowlen, moreover,

---

[9] The record revealed that Father completed counseling in January 2008 and that the termination trial took place during February.

38

expressed that she was unsure how steady Father's jobs were because he and Mother did not have enough money to pay for bus tickets.[10]

### b. From Father's Standpoint

Father admitted that his current service plan was similar to one that he was given in the summer or fall of 2006 and that initially he did not work any of the services. Once Father began working his service plan, he gave a urinalysis and completed parenting classes, twelve weeks of individual counseling, twelve weeks of couples counseling, anger management classes, and the CATS program, which is a drug and alcohol assessment.

Father admitted that he has an anger problem and testified that Mother "has a lot of anger issues." Father admitted that he was taking anger management classes when he kicked out the back window of the patrol car. Father said that through his classes, he has learned about self-control and about not "overaggressing" when someone offends him, and he is a better person today. Father said that he knows that it is wrong to hit Mother and that assaults do not create a safe environment for children.

Father admitted that he had not completed his psychological evaluation. He said that he had tried to get a psychological evaluation but that he had lost

---

[10] Father worked as a plumber.

his job[11] and did not have the money to get one before October 2007; then, when he tried to get one, the facility had stopped doing psychological evaluations. He also admitted that part of the reason he had not completed his psychological evaluation was because he had "been in and out of jail."

Father testified that his mother is an appropriate caregiver for his children: "She's fine. She thinks that she's mentally messed up, but she's not." Father later testified, "[M]y mom's crazy." Father admitted that his mother fights with Mother and agreed that it would be dangerous if he, his mother, and Mother all lived together.

With regard to the condition of the house in 2006, Father testified that they had a new dog and had left him in the house all day and all night. Father said that the police officer had lied about the holes in the wall and the doors being off the hinges because there were only two holes in a door.

Father testified that he had lived in three places during the year before the trial and that he did not have a stable environment at the time of trial; he lost his house because his landlord had sold it. At the time of the trial, Father was

---

[11] Father's testimony regarding his employment was contradictory. In addition to the statement above, he testified that he had been continuously employed for the last year and that sometimes he could not make his visits because of work; however, he also said that he is working with a friend because he has a hard time getting a job due to his criminal background.

living with his uncle, whom he described as a "drug head," but Father did not have a steady place to house the children because he had not asked his uncle if they could live with him.

### 5. Plans for the Future

### a. Father's Plans

Father's testimony regarding his plans for the children was somewhat confusing. Father testified that he and Mother are going to "let their relationship go" because they want to get their children back, but he later described Mother as his "soon-to-be wife." Father said that he did not want to relinquish his parental rights; he said that they would have to be terminated. Father thereafter testified that it would be in the best interest of the children to not be returned to him, though he later contradicted himself by testifying that it would be in the children's best interest to be placed with him because he would take care of them.

Father testified that Mother is a good mom to his children and that they both care for the children. Father testified that the children could be placed with Mother and that he wants Mother to have a chance to raise the children because he knows that she loves them and that they love her. Father testified that he had saved $800 and would financially support the children and Mother, who was living at the shelter. Father said that Mother could have possession

41

of the children because he wants to see the children raised with one of their parents. Father proposed that the children would be kept safe by Mother going to church and not taking them to places that children should not go.

When asked whether there were any relatives who could take the children, Father testified that his children would be better off in foster care than with one of his relatives because his family does not care.

### b. CPS's Recommendation and Plan

Cumberbatch testified that it was in R.R.'s best interest to terminate Mother's and Father's parental rights. Cumberbatch testified that CPS's plan was for R.R. to be adopted by his foster parents.

Bowlen also testified that it was in the children's best interest to terminate Mother's and Father's parental rights and that the plan was for the children to be adopted by their current foster family because the children need a safe, stable home, as well as permanency and stability. Bowlen said that, in her opinion, Father currently cannot provide a safe environment for the children.

### 6. Trial Court's Disposition

After hearing the above evidence, the trial court found by clear and convincing evidence that Mother and Father knowingly placed or knowingly allowed R.R. and V.R. to remain in conditions or surroundings which endanger their physical or emotional well-being, engaged in conduct or knowingly placed

42

the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, and that termination of the parent-child relationship was in the children's best interest. The trial court therefore terminated the parent-child relationship between Mother and R.R. and V.R. and between Father and R.R. and V.R.

## B. Burden of Proof and Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute, and just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, TDFPS seeks not just to limit parental rights but to erase them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination

43

proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

> (1) the child's age and physical and mental vulnerabilities;
>
> (2) the frequency and nature of out-of-home placements;
>
> (3) the magnitude, frequency, and circumstances of the harm to the child;

45

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (A) the desires of the child, (B) the emotional and physical needs of the child now and in the future, (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody, (E) the programs available to assist these individuals to promote the best interest of the child, (F) the plans for the child by these individuals or by the agency seeking custody, (G) the stability of the home or proposed placement, (H) he acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

47

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### C. Termination Was in the Children's Best Interest

Because Father claims that factually insufficient evidence exists to establish that termination of his parental rights are in the children's best interest, we begin our analysis with the factors listed in family code section 263.307(b).

With regard to the first factor, the children involved were very young at the time of the termination trial and were therefore physically and mentally vulnerable.

Under the second factor, the record revealed that CPS placed R.R. in a foster home and were able to place V.R. in the same foster home when she was born; there is no evidence in the record that the children were ever moved to another foster home or returned to their parents after they were removed.

48

With regard to the third, fourth, and ninth factors, Bowlen stated that prior to CPS's intervention, R.R. was exposed to many domestic violence incidents involving Father, Mother, and Father's mother.

Due to the children's young ages, the record did not detail whether they would be fearful of returning to their parents, but Bowlen testified that the foster mother is the only mother figure V.R. has bonded with.

With regard to the sixth factor, the record did not include psychiatric, psychological, or developmental evaluations of the children. However, the foster mother testified that R.R. is developmentally delayed and is receiving speech therapy. The record also demonstrated that Father's mother, who lived with the family, was unstable and suffered from mental health issues. Father did not complete his psychological evaluation, so it is not part of the record.

The record was replete with evidence of the seventh and eighth factors. As set forth in detail above, Father and Mother engaged in domestic violence on numerous occasions, resulting in law enforcement and CPS involvement. Additionally, the record revealed that Father had several convictions, including one for bodily injury to a child; that he abused alcohol; and that he had previously used drugs.

With regard to the tenth and eleventh factors, Father did not initially comply with his service plan. At the time of the termination trial, Father had

49

completed most of the items on his service plan, but Bowlen testified that he had failed to change his behavior.

The twelfth factor—whether the child's family demonstrates adequate parenting skills—was not put to the test because R.R. and V.R. were removed when they were little and because Father was in and out of jail during the time this case was pending. But there was evidence that while Father and Mother were fighting, they ignored R.R., who was crying the entire time the police were at the residence in response to a domestic violence incident. The record also revealed that Mother and Father's counselor told the CPS worker that Mother and Father were not capable of parenting children "at this time." Additionally, Father did not have a safe physical home environment established for the children as of the time of the termination trial.

Father testified regarding the final statutory factor when he said that his children would be better off in foster care than with his family because his family does not care.

Regarding the first *Holley* factor, the children did not testify at trial. Although Father testified that both he and Mother care for the children, the evidence revealed that both V.R. and R.R. are doing well in their foster home and seem bonded to the foster parents.

Regarding the second factor—the children's present and future physical and emotional needs—the foster mother testified that R.R. is developmentally delayed and has tubes in his ears due to recurrent ear infections that caused him moderate hearing loss. Bowlen mentioned that R.R. does not talk much during the visits, and the foster mother testified that R.R. is receiving speech therapy to address this.

The third and eighth factors—the emotional and physical danger to the child now and in the future and the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one—were at the heart of this case. The record demonstrates that Father hit Mother during both of her pregnancies and that Father and Mother's domestic violence disputes were ongoing through Christmas 2007, which was approximately six weeks prior to the start of the termination trial. As mentioned above, R.R. was present during numerous domestic violence incidents prior to his removal by CPS. The record also revealed that Father was in and out of jail during this case, leaving Mother—who also had an anger management problem—to parent R.R. and that Mother often left R.R. with Father's mother, whose mental health was often volatile. Moreover, the record contained evidence of unsafe and unstable housing.

Regarding the fourth factor—the parental abilities of the individuals seeking custody—Mother testified that before R.R. was removed from their home, Father fed, bathed, and diapered him and was involved in his life. Father testified that he had never hit the children. Mother testified that Father is a great father as long as he does not drink.

Concerning the fifth factor, Father attempted to better himself by attending parenting classes, twelve weeks of individual counseling, twelve weeks of couples counseling, anger management classes, and the CATS program. However, he failed to undergo a psychological evaluation.

Regarding the parties' plans for the children—the sixth factor—Father's plans regarding his parental rights were confusing, but overall, he appeared to want the children placed with Mother and said that he would financially support the children and Mother. Father admitted that he did not have a stable home available to put the children in as of the time of trial.

Mother testified that Father would be a good father and would come and visit, but she is not sure that it would be a good thing for him to visit because he likes to drink and because she did not "know how his reactions would be." Mother said that she has concerns that Father would be drinking and not taking care of the children.

Both Cumberbatch and Bowlen testified that CPS's plan was for the children to be adopted by their current foster family.

Regarding the stability of the proposed placement—the seventh factor—the evidence demonstrated that terminating Father's parental rights would allow CPS to pursue adoptive placements for the children, which would allow them to have the stability lacking in their current situation.

Finally, concerning the ninth factor—any excuse for the parents' acts or omissions—Father admitted drinking alcohol prior to several of the domestic violence episodes. Father said that he knows that it is wrong to hit Mother and that assaults do not create a safe environment. He felt that he was a better man after completing his parenting classes and counseling.

In sum, the record demonstrates that CPS and the police had extensive involvement with this family. Father's long history of engaging in domestic violence, difficulty maintaining safe and stable housing, inconsistent employment history with no guaranteed income, and inappropriate choices that put his children in danger, such as allowing his mother to live with them despite her unstable mental health and volatile relationship with Mother, all demonstrate that it was in the children's best interest that Father's parental rights be terminated. *See* Tex. Fam. Code Ann. § 161.001(2).

53

Giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Father's parental rights would be in the children's best interest. *See In re M.B.*, No. 02-07-00280-CV, 2008 WL 2930530, at *14 (Tex. App.—Fort Worth July 31, 2008, no pet.) (mem. op.) (holding that evidence was factually sufficient to support jury's finding that termination of appellant's parental rights was in children's best interest because TDFPS had received eight to ten referrals about appellant; appellant had difficulty maintaining safe and stable housing; appellant had an inconsistent employment history with no guaranteed income; and appellant made inappropriate choices by living with a sex offender and engaging in domestic violence); *see also In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed that termination of father's parental rights was in child's best interest where, among other factors, father was incarcerated at time of termination hearing and had a pattern of criminal and violent conduct). Accordingly, we hold that the evidence is factually sufficient to support the trial court's best-interest finding. We overrule Father's first issue.

## IV. CONCLUSION

Having sustained a portion of Mother's first issue and a portion of Father's second issue, we remand this case to the trial court so that notice may be sent in compliance with the ICWA, as outlined above. If, after notice and a hearing, the trial court determines that R.R. and V.R. are not Indian children, then the termination judgment of the trial court is affirmed. If, after notice and a hearing, the trial court determines that R.R. and V.R. are Indian children, then the termination judgment of the trial court is reversed, and the trial court shall conduct a new trial applying the ICWA. *See, e.g.*, *Junious M.*, 144 Cal. App.3d at 788, 193 Cal. Rptr. at 40; *R.E.K.F.*, 698 N.W.2d at 150 (citing numerous cases utilizing this procedure); *I.E.M.*, 233 Mich. App. at 450, 592 N.W.2d at 758; *C.H.*, 510 N.W.2d at 124. Having overruled the balance of Mother's first issue, the balance of Father's second issue, and Father's first issue, we grant only the relief outlined above.

SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: March 19, 2009

55