

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00155-CV

IN THE INTEREST OF K.J.L.

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant F.C. (Father) appeals the judgment terminating his parental rights to his daughter, K.J.L. Father argues in one issue that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in K.J.L.'s best interest. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

K.J.L.'s mother (Mother) voluntarily relinquished her parental rights to K.J.L. and is not a party to this appeal. Father was represented by counsel at the April 2013 termination trial but did not personally appear.

Keri Wellinghoff is an investigator for the Department of Family and Protective Services (the "Department"). She investigated a June 13, 2012 referral about K.J.L., who was about three and one-half months old at the time. Wellinghoff met with Mother on the day of the referral and tested Mother for drug use; the test was positive for methamphetamines, amphetamines, and cocaine. Mother informed Wellinghoff that she had recently relinquished her parental rights to her older daughter, that she had previously lived in several different shelters, and that she had most recently stayed in a motel but had been evicted. Mother admitted leaving K.J.L. with a woman who was essentially a stranger the night before. The woman lived at the motel from which Mother had been evicted, and Mother said she left K.J.L. with the woman so that K.J.L. could sleep inside since Mother was sleeping outside. The woman refused to relinquish K.J.L. to Mother the next day, and the women had an altercation.

Mother told Wellinghoff that Father had recently been released from jail for assaulting Mother in January 2012 while Mother was pregnant with K.J.L. Mother said the January 2012 assault charge was Father's third and that he was on parole.

2

Mother provided Wellinghoff with three temporary placements for K.J.L., but all three placements were ruled out, two for prior history with the Department and the third for unwillingness to take custody of K.J.L. Wellinghoff also spoke with Mother's mother, who expressed concern about Mother's ability to care for K.J.L. and about the domestic violence between Mother and Father.

Wellinghoff met with Father later the same day. Father expressed concern about Mother's instability but not Mother's drug use. He confirmed that he had two prior assault charges, but he said that he was not the aggressor. Father admitted, though, that he had been jailed for assaulting Mother. Wellinghoff also learned that Father had prior Department referrals with reason-to-believe dispositions for domestic violence against the mothers of his children.

Wellinghoff testified that she did not feel comfortable releasing K.J.L. to Father because of the domestic violence involving Mother. She asked Father for potential placements but could not approve any of Father's suggestions. The Department thus staffed the case for emergency removal and placed K.J.L. into foster care.

Several documents were admitted into evidence that relate to Father's criminal history. Those exhibits reflect that, including the assault charges discussed above, Father had convictions for terroristic threat and resisting arrest in May 2003, criminal trespass in May 2005, possession of marijuana in February 2006, assault causing bodily injury in April 2007, assault causing bodily injury to

3

a family member in October 2007, assault causing bodily injury in September 2009, and delivery of marijuana and burglary of a habitation in November 2009.

Gladys Demus testified that she was the Department caseworker for this case. Upon receiving the assignment and reviewing the parents' current information and Department history, Demus was concerned about Mother's homelessness, drug use, history of abusive relationships, and voluntary relinquishment of her parental rights to her older child. Demus was concerned about Father's criminal record, including his history of domestic violence, and his history with the Department that included reason-to-believe dispositions.

Demus prepared a service plan for Father and spoke with him shortly after the case began. Father did not show up for his appointment to discuss the service plan, and Demus testified that she only spoke with Father "maybe twice" by telephone during the case. Demus later mailed Father's service plan to him at the address he had provided on his waiver of service form, but the service plan was returned as undeliverable. Demus asked Father for his current contact information, but he refused to provide it. Father told her that the phone number he had provided was his sister's.

Demus testified that she received a telephone call one day from a woman who asked to take custody of K.J.L. and who said that Father had asked her to call. Demus asked the woman to have Father call her and confirm that Father was requesting that K.J.L. be placed with the woman. Demus testified that Father never called her about the woman and that her last contact with Father

4

was in July 2012. She said that she heard in about November 2012 that Father had been shot and hospitalized, but she was not able to confirm that information. Demus testified that Father had not made any progress toward his service plan, nor had he visited K.J.L. during the case. Father, in her opinion, had not shown an ability to provide a safe environment for K.J.L., and Demus testified that termination of Father's parental rights would be in K.J.L.'s best interest.

Demus testified that K.J.L. was placed with A.C. and M.C. in November 2012 and lives there with her half-sister. A.C. is related to Mother or Father, but the relationship is not clear from the record. When K.J.L. first went into foster care, she had seasonal allergies, would occasionally breakout with a rash, but was "pretty healthy." By the time of trial, K.J.L. was "doing great," was starting to walk, and seemed to enjoy living with A.C. Demus testified that K.J.L. is "very close and bonded" with her foster parents and her sister and that she has had visitations with Mother's mother. K.J.L. is developmentally on target. A.C. and M.C. wish to adopt K.J.L., and Demus testified that she believed they will be able to meet K.J.L.'s emotional, physical, and financial needs.

The trial court signed a judgment on April 15, 2013, terminating Father's parental rights. The trial court found that termination would be in K.J.L.'s best interest; that Father had knowingly placed or knowingly allowed K.J.L. to remain in conditions or surroundings that endangered her emotional or physical well-being; that Father had engaged in conduct or knowingly placed K.J.L. with persons who had engaged in conduct that endangered her physical or emotional

5

well-being; and that Father had constructively abandoned K.J.L.  This appeal followed.

### III.  Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."  *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Id.*; *Holick*, 685 S.W.2d at 20–21.  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008).  Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious

6

than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder

7

could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Best Interest

Father contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in K.J.L.'s

best interest. Father does not challenge the trial court's statutory endangerment findings, and we therefore do not address them.

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

9

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B. Discussion**

To support his argument, Father points to evidence that he was not the offending parent that led to the Department referral and that there is no evidence to link him to the event. Father also points out that the clerk's record contains an apartment address for him, which he says "implies that [he] can provide K.J.L. with a stable home [and] adequate housing."

Without repeating the evidence discussed above, Father has an extensive criminal history that includes possession and delivery of marijuana, burglary of a habitation, and domestic violence. He assaulted Mother while she was pregnant with K.J.L. He did not exercise visitations with K.J.L. during the case, nor did he complete any portion of his service plan. Father also refused to provide contact information upon request by Demus. *See In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (holding that parent's extensive criminal record also reflects on best interest of children in maintaining

10

relationship with that parent); *In re R.R.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.) (holding that exposure to domestic violence is relevant when considering child's best interest); *see also In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *9 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (noting in best-interest analysis the mother's failure to complete her service plan other than attending a few parenting classes). Moreover, the Department was unable to approve of any of Father's or Mother's suggested placements for K.J.L., and Demus testified that K.J.L. is doing well in foster care; that K.J.L. is bonded with her sister and foster parents; that the foster parents wish to adopt K.J.L.; and that the foster parents can provide for K.J.L.'s emotional, physical, and financial needs.

Considering the *Holley* factors listed above and applying the appropriate standards of review, we hold that legally and factually sufficient evidence supports the trial court's finding that termination of Father's parental rights is in K.J.L.'s best interest. We overrule Father's sole issue.

### V. Conclusion

Having overruled Father's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED: September 12, 2013

11