## IN the INTEREST OF T.R.[1]

### No. 04–15–00639–CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: April 4, 2016

1. Although the trial court cause was styled *In the Interest of W.A.H.-R.*, the only child at issue in this appeal is T.R.

Joe K. Bohac, Law Office of Joe K. Bohac, San Antonio, TX, for Appellant.

Mary Beth Welsh, Assistant Criminal District Attorney, Nicolas A. LaHood, District Attorney, Bexar County, San Antonio, TX, for Appellee.

Sitting: Sandee Bryan Marion, Chief Justice, Marialyn Barnard, Justice, Patricia O. Alvarez, Justice

## OPINION

Patricia O. Alvarez, Justice

Appellant A.M.C.[2] appeals the trial court's order terminating her parental rights to her child, T.R. A.M.C. raises two issues on appeal: (1) the trial court erred in failing to comply with the Indian Child Welfare Act; and (2) the evidence is legally and factually insufficient to support the trial court's findings that termination of A.M.C.'s parental rights is in T.R.'s best interest. We conclude that, based on a review of the evidence, the trial court did not err in failing to provide notice under the Indian Child Welfare Act and that the evidence is both legally and factually sufficient to support the best interest determination. Accordingly, we affirm the trial court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

Because the only child at issue in this appeal is T.R., we limit our discussion to the facts relating to T.R.

In February 14, 2012, following two attempted suicides by A.M.C. while her minor children were present, and A.M.C.'s positive drug tests, the Texas Department of Family and Protective Services was named temporary managing conservator of T.R. and his brother. The Department's original service plan and goal was to return the children to A.M.C. The caseworker's original progress report, filed on July 19, 2012, indicated that A.M.C. denied that either T.R. or his brother had American Indian status.

The case remained pending in different stages before the trial court for almost four years. During that time, A.M.C. participated, off and on, in different services offered by the Department. A.M.C.'s mental health issues and continued drug use were constant sources of concern for her caseworker and the trial court. On March 4, 2013, following a mediated settlement agreement, the trial court entered Final Orders appointing the Department as permanent managing conservator for both children and A.M.C. as possessory conservator. A.M.C. continued to deny American Indian Child status for both children. On February 26, 2014, T.R.'s brother aged out of foster care.

On January 14, 2015, for the first time since the children were removed in 2012,

---

**2.** For purposes of this appeal and for the privacy of the child, we refer to the appellant and child by their initials.

and in direct contradiction to all of the proceedings and status reports filed after T.R.'s removal, T.R.'s great-grandmother reported that T.R. had relatives that were full blooded Native Americans.

On March 3, 2015, the Department filed a Petition to Modify the trial court's March 4, 2013 Final Orders seeking termination of A.M.C.'s parental rights. After several more hearings and trial settings, the matter was called to trial on July 14, 2015, and testimony was presented by the Department. The matter was reset for August 28, 2015, and additional testimony was heard by the trial court.

On September 24, 2015, the trial court signed a termination order concluding that termination of A.M.C.'s parental rights was in T.R.'s best interest and further found that the Department's motion to terminate parental rights should be granted under Texas Family Code sections 161.001(b)(1)(E), (N), and (O). *See* Tex. Fam.Code Ann. § 161.001(b)(1)(E), (N), (O); (b)(2). This appeal ensued.

We first address A.M.C.'s contention that the trial court failed to comply with the Indian Child Welfare Act.

### Indian Child Welfare Act

■ The Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901–63 (2012), applies to an involuntary child custody proceeding pending in a state court when "the court knows or has reason to know that an Indian child is involved" in a child custody proceeding. 25 U.S.C. § 1912(a); *In re R.R. Jr.,* 294 S.W.3d 213, 217 (Tex.App.– Fort Worth 2009, no pet.); *Doty–Jabbar v. Dall. Cty. Child Protective Servs.,* 19 S.W.3d 870, 874 (Tex.App.–Dallas 2000, pet. denied). The Act articulates a federal policy that, where possible, an Indian child should remain in the Indian community. *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 36–37, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). The ICWA's goal is to provide procedural and substantive standards for child custody proceeding; it includes a termination of parental rights action. 25 U.S.C. § 1903(1)(ii); *Miss. Band of·Choctaw Indians,* 490 U.S. at 36, 109 S.Ct. 1597.

### A. Standard of Review

■ The trial court's application of the ICWA is reviewed de novo. *See In re J.J.C.,* 302 S.W.3d 896, 902 (Tex.App.– Waco 2009, order); *In re W.D.H.,* 43 S.W.3d 30, 33 (Tex.App.–Houston [14th Dist.] 2001, pet. denied).

### B. Arguments of the Parties

A.M.C. contends the record is void of any evidence of notice to either one of the tribes or the Bureau of Indian Affairs, as required by 25 C.F.R. § 23.11. The State counters that no evidence was ever presented that T.R. was an Indian child within the meaning of the ICWA.

### C. Notice Requirements under the Indian Child Welfare Act

Under the ICWA, an Indian tribe is entitled to notice of a custody proceeding involving an Indian child. *See* 25 U.S.C. § 1912(a). It is the duty of the trial court and the Department to send notice in any involuntary proceeding "where the court knows or has reason to know that an Indian child is involved." 25 C.F.R. § 23.11(a). A violation of the ICWA notice provisions may be cause for invalidation of the termination proceedings at some later, distant point in time. *See* 25 U.S.C. § 1914 (noting that Indian child's tribe may petition any court of competent jurisdiction to invalidate such action); *In re W.D.H.,* 43 S.W.3d at 38–39 (recognizing a parent possesses standing under ICWA to challenge adequacy of notice even if tribe declined to join suit).

Because the termination proceeding here will likely result ultimately in T.R.'s adoption by his current placement, strict compliance with the notice provisions of the ICWA is required. *See In re J.J.C.*, 302 S.W.3d at 902 (remanding because strict compliance to the notice requirement was not met); *In re R.R. Jr.*, 294 S.W.3d 213, 224–25 (Tex.App.–Fort Worth 2009, no pet.) (stating substantial compliance with notice requirement insufficient).

**D. Analysis**

■ We, thus, turn to the information available to the trial court at the time of the termination proceedings.

*1. Documentation Prior to July 14, 2015*

The record before this court includes a multitude of progress reports filed by the Department caseworkers. From February of 2012 to January of 2015, each of these reports indicated "[T.R.]'s American Indian child status denied by [A.M.C.]" On January 28, 2015, the caseworker's report, *for the first time*, indicated the following:

> According to great grandmother, [I.C.], she has two relatives that were full blooded Native Americans. One was from the Cherokee Nation and the other from the Choctaw Nation. [I.C.] reports that there is no registered member in her family under the Choctaw Nation. [I.C.] reports she is registered in the Cherokee tribe; however, this particular tribe is not recognized by Congress. The tribe is from Arkansas and it is a "no name" Cherokee tribe because it is not yet recognized. [I.C.] reports none of her children or grandchildren were registered for any tribe.

On June 29, 2015, A.M.C.'s attorney asserted, *for the first time*, a motion for continuance contending as follows:

> [T.R.'s brother], is a child of Native American Heritage; that neither the Bureau of Indian Affairs nor the tribe to which the child claims as heritage [has] been notified, and none of the requirements set forth in the Indian Child Welfare Act have been followed, and this court therefore has no jurisdiction to hear this matter until the requirements of the Indian Child Welfare Act have been adhered to by the Petitioner.

We note the record before this court does not include a similar designation by A.M.C.'s attorney regarding T.R., the only child at issue in this appeal.

*2. Trial Proceedings: July 14, 2015*

On July 14, 2015, prior to the start of testimony, A.M.C.'s attorney requested a continuance based the trial court's failure to comply with the notice requirement under the ICWA. The Department responded as follows:

> ...the issue involving the Indian Child Welfare Act was looked into and researched. ICWA only applies when there is a case involving a federally recognized tribe, and a family member who is biologically connected to the tribe who is a registered member of that federally recognized tribe. Grandmother in this instance was unable to establish membership of the Choctaw Nation. Her children and grandchildren, therefore, would not be eligible.
>
> Additionally, there had been discussions previously with mom and with the grandmother about this issue, and they do not qualify.
>
> This issue was looked into in the past as well in this case. So it was not just recently investigated. I believe it was looked into many, many months ago as well.

The trial court acknowledged both the investigation performed by the Department and the previous discussions pertaining to whether ICWA was applicable

*3. Recognized Indian Tribe*

■ As noted above, beginning in January of 2015, the Department status reports indicated that T.R.'s great-grandmother was possibly from Chocktaw Nation descent. Importantly, however, the ICWA's requirements for notification and determination of Indian status apply only when "the court knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). The question before us, then, is whether the trial court correctly determined T.R. was not an Indian child pursuant to the ICWA. *See In re Trever I.*, 973 A.2d 752, 758 (Me.2009) (noting that "the party asserting the applicability of the ICWA has the burden to provide sufficient information to at least put the court or Department on notice that the child may be an 'Indian child,' within the meaning of the ICWA, and that further inquiry is necessary"); *In re Arianna R.G.*, 259 Wis.2d 563, 657 N.W.2d 363, 370 (2003) (holding that ICWA notice provisions did not apply because "the information available to the court was too vague for the court to have reason to know" that children were Indian where only evidence was father's statement that his children have "Indian heritage" and that their "ancestry stems from the Ojibwa Tribe in Marinette, Wisconsin").

Section 1903 provides the applicable definitions:

(4) "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe;

. . . .

(8) "Indian tribe" means any Indian tribe, band, nation, or other organized group or community of Indians *recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians,* including any

Alaska Native village as defined in section 1602(c) of Title 43;

25 U.S.C. § 1903(4), (8) (emphasis added)

The information regarding any ties between T.R. and an Indian tribe was provided by T.R.'s great-grandmother. According to his great-grandmother, no member of his family was registered under the Choctaw Nation. She did report, however, that she was a member of a Cherokee tribe. Yet, the very same information that T.R.'s great-grandmother relayed indicating a potential link between T.R. and an Indian tribe also provided that the Cherokee tribe in question was not recognized by Congress. There was no testimony or evidence to the contrary.

Because the ICWA only applies to recognized tribes, we conclude a review of the entire record supports there was insufficient evidence that T.R. was an Indian child, as defined by the ICWA. *See id.* Accordingly, the trial court properly determined the ICWA's notice requirement "where the court knows or has reason to know that an Indian child is involved" was inapplicable. *See* 25 C.F.R. § 23.11(a). As such, no notice was required and we overrule A.M.C.'s first issue on appeal.

We next turn to A.M.C.'s challenge of the trial court's holding that termination of A.M.C.'s parental rights was in T.R.'s best interest.

### SUFFICIENCY OF THE EVIDENCE—BEST INTEREST OF THE CHILD

#### A. Standard of Review

■ "Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them except for the child's right to inherit from the parent." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex.App.–Corpus Christi

2010, no pet.) (citing *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985)). As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent. *See id.* (citing *In re D.S.P.,* 210 S.W.3d 776, 778 (Tex.App.–Corpus Christi 2006, no pet.)).

▇▇▇ An order terminating parental rights must be supported by clear and convincing evidence that (1) the parent has committed one of the grounds for involuntary termination as listed in section 161.001(1) of the Family Code, and (2) terminating the parent's rights is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(b); *In re J.F.C.,* 96 S.W.3d 256, 261 (Tex.2002). "There is a strong presumption that the best interest of a child is served by keeping the child with its natural parent, and the burden is on [the Department] to rebut that presumption." *In re D.R.A.,* 374 S.W.3d 528, 533 (Tex.App.–Houston [14th Dist.] 2012, no pet.). "The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child." *Id.*

▇▇▇ When a clear and convincing evidence standard applies, a legal sufficiency review requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.,* 163 S.W.3d 79, 85 (Tex. 2005) (quoting *In re J.F.C.,* 96 S.W.3d at 266). If the court "determines [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true," the evidence is legally sufficient. *See id.* (quoting *In re J.F.C.,* 96 S.W.3d at 266).

▇▇▇ Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002); *accord In re K.R.M.,* 147 S.W.3d 628, 630 (Tex.App.–San Antonio 2004, no pet.). We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.,* 96 S.W.3d at 266; *accord In re C.H.,* 89 S.W.3d at 25.

## B. Best Interest of the Child

▇▇▇ A trial court may terminate a parent's rights to a child if it finds, inter alia, such "termination is in the best interest of the child." TEX. FAM.CODE ANN. § 161.001(b)(2); *accord In re J.F.C.,* 96 S.W.3d at 261.

### 1. Evidence Regarding the Child's Best Interest

Applying the applicable standards of review for sufficiency of the evidence, we examine all the evidence, *see In re J.F.C.,* 96 S.W.3d at 266; *see also City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005) (crediting or disregarding evidence), and recite below the evidence that especially pertains to the *Holley* factors, *see Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976). On several occasions, the trial court noted the length of time and numerous hearings previously held regarding T.R. In addition to the multiple reports filed by the Department, the trial court heard witness testimony on two different days: July 14, 2015, and August 28, 2015.

#### a. A.M.C.

A.M.C. testified that T.R. was almost fifteen years old. A.M.C. was previously diagnosed as bipolar, but she was not currently taking medication. When asked about housing, A.M.C. testified that she was currently living with a friend and, prior to that, she had lived with a different friend off and on for several months. She had moved four times in two years.

A.M.C. contended that she could provide T.R. with a safe and stable home environment; however, she was self-employed as a landscaper and did not consider herself financially stable. A.M.C. also acknowledged being in individual counseling, "I'll be in it for the rest of my life. Thanks to y'all."

Much of the testimony focused on A.M.C.'s continuous lack of follow through on decisions or agreements made with the Department and her tendency to blame others for her failures. For example, A.M.C. acknowledged participating in mediation in February of 2013, but contested whether the mediation was voluntary and whether she was in agreement with the mediated settlement agreement she signed.

During her testimony, A.M.C. finally conceded she attends Alcoholics Anonymous meetings, but that she had not participated in a drug treatment program. She further acknowledged a previous addiction to methamphetamines and amphetamines, but conceded she did not submit to the trial court's hair follicle test orders. A.M.C. also admitted that she had several criminal charges pending—a misdemeanor criminal trespass charge and two felony possession charges stemming from different counties.

### b. K.B., Department Caseworker 2012–2013

The Department's conservatorship caseworker assigned to A.M.C. between 2012 and 2013 also testified. The caseworker testified that she requested A.M.C. submit to several random drug tests. During a one-year period, A.M.C. refused to submit to eight tests, tested positive on three other occasions and negative on another five tests.

Although A.M.C. completed domestic violence classes, the caseworker testified that A.M.C.'s attendance was sporadic and she missed many appointments.

When asked about concerns regarding A.M.C.'s individual therapy, the caseworker focused on A.M.C.'s "going back and forth between accepting responsibility and not accepting responsibility. Placing the blame on the Department and others in her family." The caseworker expressed concern regarding A.M.C.'s tendency to blame others for problems that she has in her life. A.M.C.'s visitation with T.R. was also sporadic and, on several occasions, A.M.C. simply failed to show.

### c. L.C., Department Caseworker 2014 to present

L.C. explained that because there was already a mediated settlement agreement, her contact with A.M.C. was somewhat limited. A.M.C. failed to complete any of the agreed to services: therapy, NA classes, and outpatient drug use treatment. She also failed to submit to the trial court ordered hair follicle test ordered the previous month. Acknowledging her contact with A.M.C. was minimal, L.C. still described A.M.C. as less than cooperative. "The most recent text from [A.M.C.] regarding the hair follicle was she wasn't going to take it unless we could guarantee that she was going to get her son back."

L.C. testified that termination of A.M.C.'s parental rights was in T.R.'s best interest. T.R.'s placement is waiting to adopt and, in her opinion, T.R. is thriving and very happy in the home. She further expressed her belief that A.M.C.'s lifestyle was concerning and that placement with A.M.C. would be contrary to, and potentially endanger, T.R.'s well-being. These concerns extend to A.M.C.'s lifestyle, her drug use, her lack of stability, and her lack of treatment for her mental health.

Several witnesses testified via telephone and were not actually present in the courtroom.

#### d. *Martha Roberts*

Martha Roberts, a therapist with Family Service Association, testified that A.M.C. was referred to counseling at the agency's Northeast office where she engaged in counseling with an intern, but when the intern left the agency, A.M.C. never returned. Roberts also conceded that the intern was not a licensed counselor, as required by the mediated settlement agreement.

#### e. *Deborah Johnson*

Deborah Johnson, a counselor from Elite Counseling, also testified telephonically. Johnson relayed that A.M.C. was assigned to counselor Keith Lyles. A.M.C., however, was terminated unsuccessfully for noncompliance on February 8, 2013. According to Johnson, A.M.C. appeared for one group counseling and then never showed up again.

#### f. *Chris Mochel*

Chris Mochel testified that he owns C.N.C. Landscape and employs A.M.C. for light landscaping and office paperwork. Mochel opined that "[A.M.C.]'s a very good employee. I'd like to have her back today, if I could." She has worked for him, off and on, for approximately a year.

### C. *Holley* Factors

■ The trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex.2006) (per curiam) (requiring appellate deference to the factfinder's findings); *City of Keller*, 168 S.W.3d at 819. The factors a fact-finder uses to ascertain the best interest of the child were set forth in *Holley*, 544 S.W.2d at 371–72, *accord In re E.N.C.*, 384 S.W.3d

796, 807 (Tex.2012) (reciting the *Holley* factors). The *Holley* court warned that "[t]his listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Holley*, 544 S.W.2d at 372. We address the major issues faced by the trial court below.

#### 1. *The Desire of the Child*

In the present case, both the caseworker and T.R.'s attorney ad litem reported T.R. wanted the trial court to terminate A.M.C.'s parental rights so that he could be adopted by his current placement. T.R.'s attorney ad litem explained, "I think that [T.R.] just wants this whole matter settled. He wants to be—he wants to feel secure. He wants to be adopted by his cousins, and he has told me that himself."

Although A.M.C. testified the Department was wrong, we conclude the trial court could have reasonably believed the caseworker and T.R.'s attorney ad litem regarding the child's wishes.

#### 2. *The Emotional and Physical Needs of the Child and Protecting the Child from Danger Now and in the Future*

Both of the caseworkers testified that A.M.C. continued to show her inability to care for the emotional and physical needs of T.R. and to protect him from danger. In addition to A.M.C.'s history of drug abuse, the caseworkers noted A.M.C.'s refusal to submit to a hair follicle tests and her two pending felony drug charges. L.C. testified that "since that mediated agreement she has virtually just done nothing. She's been obstructive. She's been very uncooperative. She's been very aggressive toward the Department and she's been very aggressive to me; just very aggressive to everyone involved."

The trial court could have reasonably determined that A.M.C. was unable to provide for T.R.'s emotional and physical

needs and that she was unable to protect him from danger now or in the future.

### 3. A.M.C.'s Abilities

The evidence was sufficient to find that A.M.C.'s abilities are limited. Throughout this case, A.M.C. was unable to secure adequate housing for T.R., or secure an income to provide nurturing or support. A.M.C. has shown that when it comes to caring for T.R. or herself, she did not exercise good judgment. A.M.C. exhibited an inability to attend the necessary counseling appointments or to seek help for her substance abuse; she also showed a propensity to continue to participate in the use of drugs.

Based on the evidence presented, the trial court could have reasonably concluded that A.M.C. lacked the decision-making skills and parental abilities to provide for and parent T.R. in a healthy and safe manner.

### 4. Programs Available to Assist A.M.C. to Promote the Best Interest of the Child

The evidence clearly supported the conclusion that A.M.C. needed assistance in her everyday life. Yet, even when the Department made resources available, A.M.C. did not accept assistance. The psychological and drug counseling would have provided A.M.C. with the skills to help with her continued drug use, as well as her ongoing mental health issues. A.M.C. chose. not to participate in the counseling required by the Department.

### D. Analysis

Based on a review of the entire record, we conclude A.M.C. showed an inability to effect the necessary positive changes in her life. She failed to participate in the programs requested or address her mental health issues. Additionally, although A.M.C. contends she was drug free, she was charged with two felony drug possessions. The trial court could have also rea-

sonably believed the testimony that A.M.C. (1) failed to provide a safe and stable home for T.R., (2) failed to provide proof of employment, and (3) failed to appropriately care for her child.

Reviewing the evidence under the two sufficiency standards, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, we conclude the trial court could have formed a firm belief or conviction that terminating A.M.C.'s parental rights to T.R. was in T.R.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re H.R.M.*, 209 S.W.3d at 108. Therefore, the evidence is legally and factually sufficient to support the trial court's order. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re H.R.M.*, 209 S.W.3d at 108.

### CONCLUSION

Because A.M.C. failed to provide the trial court with evidence that T.R. qualified as an Indian Child under the Indian Child Welfare Act, the trial court's proceeding with the termination of A.M.C.'s parental rights was not error.

The trial court found A.M.C. committed the statutory grounds supporting terminating her parental rights and that termination of A.M.C.'s parental rights was in the child's best interest. A.M.C. only appealed the best interest of the child finding.

Having reviewed the evidence, we conclude it was legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of A.M.C.'s parental rights to T.R. was in T.R.'s best interest.

Accordingly, we overrule both of A.M.C.'s issues on appeal, and we affirm the trial court's order.