

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00173-CV

———————————————

IN THE INTEREST OF A.E., A CHILD

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. 17-10158-158

Before Gabriel, Bassel, and Womack, JJ.
Memorandum Opinion and Order by Justice Gabriel

## MEMORANDUM OPINION AND ORDER

Appellant T.S. (Mother) appeals the trial court's order terminating her parental rights to her son A.E. (Adam).[1]  In her first issue, Mother complains that the trial court jurisdictionally erred by extending the case's dismissal deadline under family code section 263.401(b).  *See* Tex. Fam. Code Ann. § 263.401(b).  In her second issue, she asserts that the trial court erred by not complying with the notice provisions of the Indian Child Welfare Act (ICWA).  *See* 25 U.S.C.A. § 1912(a).  In her third issue, Mother contends that the trial court erred by not complying with ICWA's qualified-expert-witness requirement.  *See id.* § 1912(f).  In her fourth issue, she alleges that the trial court erred by not making ICWA's required finding beyond a reasonable doubt that Adam's continued custody by her or an Indian custodian would likely cause the child serious physical or emotional damage.  *See id.*  Finally, in her fifth issue, Mother challenges the factual sufficiency of the evidence to support the trial court's best-interest finding, embedding a fundamental-fairness subissue as well as an argument based on the ICWA standard of review, *see id.*

---

[1]In this opinion, we use aliases to refer to the subject child and his family.  *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

We overrule Mother's first issue and that portion of her fifth issue not based on ICWA. But we sustain her second issue, conditionally affirm the trial court's judgment, abate the appeal, and remand this case to the trial court.

We direct the trial court to ensure prompt and proper notice under ICWA, to conduct a hearing to determine whether Adam is an Indian child under ICWA, and to transmit a supplemental reporter's record of the hearing and a supplemental clerk's record containing a copy of the ICWA-compliant notice, the trial court's written findings, any return receipts, and any other supporting documentation to this court by November 6, 2019. No extensions will be granted in this ultra-accelerated appeal. *See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

If we receive a supplemental record by Wednesday, November 6, 2019, that contains the trial court's determination that Adam is not an Indian child, we will affirm. Otherwise, we will reverse for a new trial. *See* 25 C.F.R. § 23.107(b)(2) (directing the trial court with reason to know that a child before it is an Indian child but not enough evidence to determine whether or not the child is an Indian child to "[t]reat the child as an Indian child, unless and until it is determined on the record that the child" is not); Tex. R. Jud. Admin. 6.2(a).

3

# I. BRIEF FACTS

Child Protective Services (CPS) removed Adam after he and Mother both tested positive for amphetamines at his November 2017 birth. Mother, a long-time user of methamphetamine with several untreated mental-health issues, a criminal history, and a lengthy CPS history, admitted before the removal that she had last used methamphetamine two days before Adam's birth.

CPS originally placed Adam in foster care but at the end of May 2018 placed him with his maternal grandmother (Grandma), with whom at least two of Mother's other four children currently lived; a foster family had adopted another child of Mother's. Grandma returned Adam to CPS in early November 2018, and he was placed back with his original foster parents, with whom he remained at the May 2019 trial.

In her trial testimony, Mother admitted that she last used methamphetamine less than a month before the trial and last used heroin in January 2019, a few months before the trial and just before her drug and alcohol assessment for CPS. She conceded that it was fair to conclude that she had shown "absolutely no behavioral change" since Adam's removal.

The trial court found that termination of the parent-child relationship between Mother and Adam was in his best interest and that Mother

> 7.2.1. knowingly placed or knowingly allowed [Adam] to remain in conditions or surroundings which endangered [his] physical or emotional well-being . . . ;

4

7.2.2. engaged in conduct, or knowingly placed [Adam] with persons who engaged in conduct, which endangered [his] physical or emotional well-being . . . ;

7.2.3. constructively abandoned [Adam], who ha[d] been in the temporary managing conservatorship of the Department of Family and Protective Services [(DFPS)] for not less than six months, and: 1) [DFPS] ha[d] made reasonable efforts to return [Adam] to [Mother]; 2) [she had] not regularly visited or maintained significant contact with [him]; and (3) [she had] demonstrated an inability to provide [him] with a safe environment; and

7.2.4. failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain [Adam's] return[,] . . . [when he had] been in the temporary managing conservatorship of [DFPS] for not less than nine months as a result of [his] removal from [Mother] for abuse or neglect . . . .

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2). The trial court terminated Mother's parental rights as well as those of R.E. (Father), who voluntarily relinquished his parental rights and did not appeal.

## II. SUBJECT MATTER JURISDICTION AND EXTENSION OF DISMISSAL DEADLINE

In her first issue, Mother contends for the first time that "[t]he trial court should not have extended the state's case against [her] when there were no 'extraordinary circumstances' within the meaning of that term as used in Texas Family Code section 263.401(b), and none were pleaded nor proved." Within her first issue, Mother claims that the trial court lacked subject matter jurisdiction because it improperly extended the case. We address Mother's jurisdictional claim because

5

subject matter jurisdiction is an issue that cannot be waived and that may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). Whether a trial court has subject matter jurisdiction is a question of law; we therefore review it de novo. *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011).

Section 263.401(a) now provides that "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing [DFPS] as temporary managing conservator," a trial court loses its jurisdiction over a "suit affecting the parent-child relationship filed by [DFPS] that requests termination of the parent-child relationship or requests that [DFPS] be named conservator of the child" "[u]nless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1)." Tex. Fam. Code Ann. § 263.401(a). DFPS filed its petition for termination against Mother and Father on November 30, 2017, and the trial court entered an order naming DFPS Adam's temporary sole managing conservator that same date. Thus, under section 263.401(a), the case's original automatic dismissal deadline was Monday, December 3, 2018. *See id.* Father filed a motion for extension of the dismissal deadline on September 25, 2018, less than a week before an October 1, 2018 trial setting. In his motion, Father asked for more time to complete his services and characterized that need as "extraordinary circumstances." *Id.* § 263.401(b). On October 3, 2018, the trial court signed an order entitled "Agreed Order Extending Dismissal Date" in which it (1) found that Father's

6

needing more time to complete his court-ordered services amounted to extraordinary circumstances, (2) found that continuing the appointment of DFPS as Adam's temporary managing conservator was in his best interest, (3) set a new trial date of March 25, 2019, and (4) set a new dismissal date of May 29, 2019. *See id.* The order recited that all the parties agreed to it, but our review of the order indicates that no party or counsel indicated by signature any substantive agreement, only approval of the order's form. *See id.* § 263.402 (providing parties may not extend the dismissal deadline by agreement). On the other hand, the record does not contain any evidence that Mother opposed Father's motion, and she did not object to the trial court's ruling or file a motion to dismiss the case; in fact, she filed a motion for continuance on May 13, 2019, the day the trial began, which the trial court denied.

When the trial court granted Father's motion to extend the case's dismissal deadline less than eleven months after issuing its first temporary order regarding Adam's conservatorship, the trial court was well within its jurisdiction to do so. *See id.* § 263.401(a). The trial court's granting Father's motion to extend the dismissal deadline allowed the trial court to keep the case on its docket (and within its jurisdiction) for an additional 180 days beyond the original deadline. *See id.* § 263.401(b); *cf. Brant Oilfield Mgmt. & Sales, Inc. v. Mountwest, Inc.*, No. 14-15-00240-CV, 2016 WL 3574669, at *2 (Tex. App.—Houston [14th Dist.] June 30, 2016, no pet.) (mem. op.) ("If the December 19th motion was a deadline-extending motion under [appellate] rule 26.1, then Brant's notice of appeal was timely filed[,] and this

7

court has subject matter jurisdiction to decide the merits."). Thus, whether the trial court erroneously granted the motion to extend the dismissal deadline while it had subject matter jurisdiction is not a jurisdictional question. *See In re P.N.T.*, No. 14-18-01115-CV, 2019 WL 2426692, at *2 (Tex. App.—Houston [14th Dist.] June 11, 2019, no pet. h.) ("[A] judgment is void only when it is shown that the court had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act as a court." (quoting *Browning v. Placke*, 698 S.W.2d 362, 363 (Tex. 1985))) (construing the prior version of the statute). Nonjurisdictional error, like a trial court's action in violation of a statute, makes the court's judgment merely voidable, not void. *Reiss v. Reiss*, 118 S.W.3d 439, 443 (Tex. 2003); *Glassman v. Goodfriend*, 347 S.W.3d 772, 780 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (op. on reh'g en banc) (citing *Reiss*). The trial court here had "jurisdiction to err." *Parrish v. Jessee*, 464 S.E.2d 141, 146 (Va. 1995) (quoting *Farant Inv. Corp. v. Francis*, 122 S.E. 141, 147 (Va. 1924)). We therefore reject both Mother's claim that the trial court lacked subject matter jurisdiction and her conflation of alleged trial error with an alleged absence of jurisdiction.

Mother did not object in the trial court to the granting of Father's requested extension of the dismissal deadline. Challenges to a voidable judgment "are subject to the rules for preservation of error." *P.N.T.*, 2019 WL 2426692, at *2. To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not

8

apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). Because Mother did not object to the trial court's extending the dismissal deadline, she failed to preserve her complaint that the trial court erred by doing so. We therefore overrule her first issue.

### III. ADAM'S BEST INTEREST

Mother does not challenge the sufficiency of the evidence supporting the trial court's findings of endangerment, nor does she directly challenge the trial court's findings that she constructively abandoned Adam and failed to comply with the court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O). However, in her fifth issue, she contends that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in Adam's best interest. *See id.* § 161.001(b)(2).

### A. STANDARD OF REVIEW

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the trial court's best-interest finding. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of Adam's and Mother's parent–child relationship would be in his best interest. Tex. Fam. Code

9

Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If a factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.[2]

## B. APPLICABLE LAW

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a conduct ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

    (A)    the child's desires;

    (B)    the child's emotional and physical needs, now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

---

[2]Because of our disposition below of Mother's second issue, we do not reach her contention in this issue that DFPS's burden under ICWA was proof beyond a reasonable doubt rather than proof by clear and convincing evidence. *See* Tex. R. App. 47.1.

(E)    the programs available to assist these individuals to promote the child's best interest;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. BEST-INTEREST ANALYSIS

### 1. Present and Future Danger

A parent's behavior that causes a child to live in uncertainty and instability—including drug abuse, a parent's mental state, and threats or attempts to commit suicide—endangers that child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Mother had serious, untreated mental-health issues and long-term drug addictions. Adam and

11

Mother both tested positive for amphetamines after his birth. Mother told the CPS investigator that she had used methamphetamine on and off for the last twenty years, since she was thirteen years old; she smoked methamphetamine with Father two or three times a day until they found out she was twenty-eight weeks' pregnant with Adam; and she relapsed and smoked methamphetamine "a couple of days" before Adam was born. Mother told psychologist Dr. Hastings that she was really only able to stop using methamphetamine when she was confined. Mother continued to smoke methamphetamine and use heroin while the case was pending, admitting at trial that she had smoked methamphetamine less than a month earlier.

Mother had severe mental-health issues at least since her teenage years. She told the CPS investigator that she had attempted suicide thirteen times. Mother told Dr. Hastings that she had experienced auditory hallucinations in the voice of her maternal grandfather, who had reportedly sexually abused her and committed suicide in her presence after she reported his conduct. Mother informed Dr. Hastings and the CPS investigator that she had been diagnosed with Bipolar I disorder with suicidal tendencies and self-mutilation and reported to Dr. Hastings that she had been confined in a state mental hospital many times. But Mother told the CPS investigator that she stopped taking her medication at the age of sixteen because of nightmares, and although she had taken medication when in prison, she stopped taking it upon her release. Dr. Hastings diagnosed Mother with methamphetamine use disorder, recurrent and severe major depressive disorder with psychotic features, posttraumatic

12

stress disorder, unspecified anxiety disorder, and unspecified personality disorder. However, the only prescription medicine Mother was taking at trial was to prevent seizures.

From this evidence, the trial court could have reasonably determined that Mother was a present and future risk to Adam's well-being and that termination of her parental rights was therefore in his best interest. *See Holley*, 544 S.W.2d at 371–72; *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 162 (Tex. App.—El Paso 2014, no pet.) (concluding in best-interest analysis that mother's decision to leave children with their father despite his psychiatric history and multiple suicide attempts placed them in emotional danger); *In re S.N.*, 272 S.W.3d 45, 53 (Tex. App.—Waco 2008, no pet.) (noting that evidence of a parent's continued drug abuse supports a finding that she is a threat of danger to the child and supports a best-interest finding); *R.W.*, 129 S.W.3d at 739–41.

### 2. Parental Abilities and Placement Plans

Adam had some withdrawal symptoms soon after he was born but had no special needs after his release from the hospital. Evidence showed, however, that Mother could not satisfy the ordinary needs of a healthy toddler.

First, Mother did not have an appreciable bond with Adam. Adam was removed from the hospital after he was born, and the caseworker testified that Mother never had any significant contact with him; she missed most of the visits she could have had with Adam, twenty-five to thirty that the caseworker personally knew

of. The caseworker also testified that Mother had not seen Adam in close to six months and had not asked how he was doing in approximately three months. In fact, Mother's last visit with Adam was a three-hour visit on November 27, 2018, and she left in the middle of it because, in her words, "she just was done." The caseworker admitted that Mother had contacted her in January 2019 to report that she had a contagious staph infection, but the caseworker stated that Mother never called back to ask for a visit thereafter. Mother disputed this testimony, testifying that she contacted the caseworker a "couple of times" about visits after reporting her illness, but the caseworker did not respond. Mother also claimed that she told the caseworker she was on antibiotics and that the caseworker did not ask for details; Mother admitted that she never told the caseworker that she was no longer contagious.

Second, the trial court could have reasonably found that Mother's drug abuse and mental illness impaired her parenting abilities. Marvin Furdge, LPC, a First Step Denton County Outreach Program drug and alcohol counselor, testified that he had completed Mother's February 2019 drug and alcohol assessment and her psychosocial evaluation. Mother told Furdge that she had last used heroin one or two weeks earlier and had last used methamphetamine "a couple of days" earlier; he believed she was under the influence during the appointment. Based on the assessment and evaluation, Furdge believed that Mother had severe drug abuse and severe depression and was in no shape to parent. Along with this testimony in the May 13, 2019 trial, the trial court also heard Mother admit that she had last used methamphetamine on April 20, 2019.

14

Third, despite Mother's having given birth to five children, she had not raised any of them, and the evidence showed that she did not know how to parent. Mother told Dr. Hastings that she was afraid to fail so she did not try to be a good parent with her older children. Dr. Hastings questioned Mother's parenting abilities based on statements she made about being "used to being on her own, rather than having her children with her," being unable to "change a poopy diaper," and doing what she could but not being able to be with her children "24/7."

Fourth, the caseworker testified that Mother had not shown an ability to provide a safe or stable environment for Adam. Mother testified that she lived in a one-bed room at a motel and had lived there about three months, but she did not pay her own rent. Instead, "[f]riends, family, and churches" paid her rent weekly. She testified that she would care for Adam with the support of the same groups but named three friends in court only with great reluctance. Mother stated that she would obtain childcare for Adam but had not researched it, nor had she researched caring for him if the trial court returned him to her after the trial.

Mother testified that she helped with housekeeping at the motel, but the caseworker emphasized that Mother had not shown proof of six months' employment or six months' stability in one home.

On the other hand, with the exception of the less-than-six-months stint he had spent with Grandma, Adam lived in the same loving foster home his entire life after leaving the hospital. The caseworker testified that the foster home was appropriate

and met his needs and that she had no concern about the foster parents' parenting abilities. She further testified that the placement was in Adam's best interest.

Given all this evidence, the trial court could have reasonably found that placement with Mother did not serve Adam's best interest. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (noting that a parent's drug use, limited contact with child, and inability to provide a stable home supported a best-interest finding).

### 3. Mother's Excuses

Mother focuses her best-interest argument on her dealings with DFPS. She contends that DFPS did not use fundamentally fair procedures in dealing with her and that there is no evidence that she received the service plan or that her other service providers received the results or recommendations of her psychological evaluation. She also alleges that she did not receive recommendations about MHMR services or the results of her drug and alcohol assessment; that she was never offered the opportunity to go to an inpatient "detox" facility or to participate in intensive outpatient drug treatment; and that DFPS did not do enough to communicate with her when she stopped responding to the caseworker by text. To the extent that Mother alleges constitutional and statutory violations, we address those allegations in the next subsection. We discuss her arguments here in the best-interest context in terms of the *Holley* factor focused on excuses for her acts and omissions as a parent. *See Holley*, 544 S.W.2d at 372.

16

Again, the best-interest analysis is child-centered. *A.C.*, 560 S.W.3d at 631. It does not focus on the parent. *In re R.A.*, No. 02-18-00252-CV, 2019 WL 490121, at *9 (Tex. App.—Fort Worth Feb. 7, 2019, no pet.) (mem. op.); *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.). Nevertheless, the trial court heard evidence from which it could reasonably conclude that DFPS reasonably assisted Mother in completing her services, that Mother knew what those services were, and that any failures of communication could be attributed to Mother. *Cf. In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.) (stating in sufficiency analysis of subsection (N) evidence that "there probably are things [DFPS] could have done differently, but the issue is whether [it] made '*reasonable* efforts[,]' not ideal efforts").

DFPS agrees with Mother that the service plan does not bear her signature but argues that the evidence shows she knew the services she needed to complete. We agree with DFPS. The record provides that Mother was present at the December 13, 2017 status hearing. The trial judge spoke to her about addressing her addiction and getting healthy quickly because of the short timeline, discussed a specific treatment program called Solutions, and orally admonished her about the service plan. Mother signed a temporary order on the same date, agreeing to its form, and that temporary order provided actions she needed to complete to obtain Adam's return and the written admonishment that her parental rights could be terminated if she failed to fully comply. The actions included getting a psychosocial evaluation, a psychological evaluation, and a drug and alcohol assessment; attending counseling and parenting

17

classes; submitting to DFPS drug testing, going to ninety AA/NA meetings in ninety days, and completing drug treatment; and establishing stable housing and stable employment for at least a six-month period. Mother was ordered to comply with DFPS's original and amended service plans throughout the case. The order also required Mother to notify DFPS and the trial court of any address or telephone number change within five days of the change.

The trial court admonished Mother about her service plan again at the January 24, 2018 status hearing. Less than a month later, in the psychological evaluation with Dr. Hastings, Mother told the psychologist about her services. Dr. Hastings's psychological report states that Mother

> indicated that CPS is requiring her to complete services including parent education, a drug and alcohol assessment, counseling, and this psychological evaluation. [Mother] indicated that CPS is also requiring her to attend substance abuse support groups.

> [Mother] indicated that she has completed her parent education program. [Mother] indicated that her drug and alcohol assessment is scheduled. [Mother] reported she cannot attend substance abuse support groups because she feels she cannot take advice from people who have not had her experience.

About a year later, when Mother completed her drug and alcohol assessment and psychosocial evaluation, she told Furdge that "her safety plan included her completing the following services: CD [chemical dependency] Evaluation, attend a self-help group five times a week, complete a psychosocial assessment, complete a psychological evaluation, and attend and complete a parenting class."

18

Mother denied any knowledge of her services at trial but backtracked when Adam's attorney ad litem asked her whether she recalled the conversation about drug treatment they had at the beginning of the case. Mother remembered the attorney ad litem giving her written information for drug treatment facilities, and Mother admitted that she had known back then, almost a year and a half before trial, that she needed inpatient drug treatment. Mother also testified that she "barely remembere[d] yesterday."

The caseworker testified that it was difficult to reach Mother at times but that she could contact her at least monthly by calling or texting her. The caseworker said that Mother usually responded the same day but "[r]ecently, really not at all." The caseworker clarified that she had not been able to reach Mother by text since April 2019 and therefore did not discuss with her the recommendations from the drug and alcohol assessment. Later, the caseworker testified that communication with Mother had been poor for the "past couple of months" and that Mother had not provided DFPS her current address, where, according to her testimony, she had lived about three months. The caseworker also testified that Mother had provided many different addresses when she had "constantly been moving" and other times refused to provide any address at all.

The caseworker admitted that during the case she had received "a couple of e-mails from" Mother, but the caseworker did not try to reach Mother by email when texting failed because "that was not [Mother's] primary contact at the time."

19

Based on all this evidence, the trial court could have reasonably concluded that Mother knew what steps she needed to take in this case to try to get Adam returned to her care and knew that she had to keep the court and DFPS updated as to her whereabouts and contact information; therefore, the trial court could have concluded that Mother was responsible for her failure to complete her service plan. Further, based on all the evidence the trial court heard at trial, the trial court could have reasonably concluded that no excuse Mother offered justified Adam's being born with amphetamines in his system, Mother's unchecked drug use, or her choice not to seek treatment for her mental illness.

### 4. Best-Interest Conclusion

Mother admitted that she had not changed her behavior since Adam's removal. She stated that she could not testify that returning him to her was in his best interest because she would not know that until she had the chance to find out. All the evidence, especially Mother's untreated drug addiction and mental illness (both of which endangered Adam), her lack of attachment to him, and her unstable housing and employment, allowed the trial court to reasonably form a firm conviction or belief that termination of Mother's parental rights was in Adam's best interest. *See C.H.*, 89 S.W.3d at 28.

### D. MOTHER'S SUBISSUE

To the extent that Mother is complaining of constitutional or family code violations within her best-interest issue—that is, the absence of fundamentally fair

procedures and DFPS's alleged violations of chapter 263—she forfeited those complaints by not raising them in the trial court and obtaining unfavorable rulings thereon. *See* Tex. R. App. P. 33.1(a); *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) (noting that error-preservation rules apply in parental-termination appeals just as in other cases alleging constitutional error); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (barring appellate review of constitutional claim not raised in trial court); *Campbell v. State*, 68 S.W.3d 747, 760 (Tex. App.—Houston [14th Dist.] 2001), *aff'd*, 85 S.W.3d 176 (Tex. 2002).

Further, to the extent Mother's best-interest argument implicitly challenges the trial court's constructive-abandonment finding or the finding that she failed to comply with the service plan, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(N), (O), we reiterate that the trial court also made endangerment findings, and Mother does not challenge those endangerment findings, *see id.* § 161.001(b)(1)(D), (E). Along with a best-interest finding, a finding of only one ground alleged under section 161.001(b)(1) is sufficient to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Having upheld the best-interest finding, we overrule Mother's fifth issue except for that portion of the issue based on ICWA, which we do not reach because of our disposition below of Mother's second issue. *See* Tex. R. App. P. 47.1.

### IV.  DEFECTIVE NOTICE UNDER ICWA

In her second issue, Mother contends that the trial court erred by not complying with ICWA's mandatory notice provisions. We agree.

On April 1, 2019, DFPS filed a "Notice of Pending Custody Proceeding Involving Indian Child." The Notice is addressed to Mother, Father, and the Bureau of Indian Affairs (BIA) Anadarko Regional Director in Tahlequah, Oklahoma, and states that Adam "is believed to be a member of or eligible for membership in a federally recognized Indian tribe[] or . . . an 'Indian child' under" ICWA. The notice provides that a copy of the petition, Exhibit 1, is attached and that "[a]dditional family history is provided in the Indian Child and Family Questionnaire (EXHIBIT 2)," but neither exhibit is attached to the notice included in the record. Further, the certificate of service appended to the notice provides that the notice was sent return receipt requested, and the certified mail return receipt request's number is handwritten on the document, but no return receipt appears in the record. We note that no party has requested to supplement the appellate record with the missing items.

On May 13, 2019, less than an hour before the trial was scheduled to begin, Mother filed a "Motion for Continuance and Petition to Transfer to Court of Jurisdiction over Indian Child if Determined Eligible." The motion alleged the following:

> 2. The attorney for Respondent Mother requests a continuance for the following reason: The child subject of this suit has been identified as a child believed to be a member of or eligible for membership in a federally recognized Indian Tribe under [ICWA]. Wherefore, in a suit for termination of parental rights, the Petitioner must comply with [ICWA], 25 U.S.C. Section 1921. Respondent Mother requests a continuance until such time as the Petitioner has complied with [ICWA] in accordance with the federal law.

22

3.    Further, Respondent Mother exercises her right to request that this proceeding be transferred to the appropriate trial court with jurisdiction over the Indian Child, if eligible.

In a brief hearing on the motion before the trial began, Mother testified that as far as she knew, she was not enrolled in a tribe but that her paternal grandparents were Indian members of the Blackfoot and Cherokee tribes. She then stated that she was unsure whether they were "actual members of a tribe" because her mother was "trying to figure out all the details on that." The trial court denied the motion.

DFPS argues that ICWA does not apply. Whether ICWA applies is a question of law that we review de novo. *In re W.D.H.*, 43 S.W.3d 30, 33 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). ICWA "applies to all state child custody proceedings involving an Indian child when the court knows or has reason to know an Indian child is involved," regardless of whether the tribe participates in the proceeding. *In re R.R.*, 294 S.W.3d 213, 217 (Tex. App.—Fort Worth 2009, no pet.); *see also* 25 U.S.C.A. § 1912(a). ICWA defines an Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4); *R.R.*, 294 S.W.3d at 217. As applicable here, the relevant federal regulations and BIA Guidelines explain that a court has reason to know that a child is an Indian child when a party says that the child is or when a party or officer of the court or agency tells "the court that it has discovered information indicating that the child is an Indian child." 25 C.F.R. § 23.107(c)(1)–(2); U.S. Dep't of the Interior,

BIA, *Guidelines for Implementing the Indian Child Welfare Act* § 23.107(c)(2) (Dec. 2016), at

https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf (last

visited Sept. 27, 2019); *R.R.*, 294 S.W.3d at 219–20 (interpreting the 1979 BIA

Guidelines). Consequently, we hold that DFPS's April 1, 2019 notice stating that

Adam "is believed to be a member of or eligible for membership in a federally

recognized Indian tribe[] or . . . is an 'Indian child'" and Mother's testimony that her

paternal grandparents were Cherokee and Blackfoot gave the trial court reason to

know that Adam is an Indian child. *See* 25 U.S.C.A. § 1912(a); *R.R.*, 294 S.W.3d at

217.

Regulation 23.111 provides that when a trial court has reason to know that a

child subject in an involuntary parental termination case is an Indian child, the court

must make sure that:

> (1) The party seeking placement promptly sends notice of each such child-custody proceeding (including, but not limited to, any foster-care placement or any termination of parental or custodial rights) in accordance with this section; and
>
> (2) An original or a copy of each notice sent under this section is filed with the court together with any return receipts or other proof of service.

25 C.F.R. § 23.111(a). If the tribe in which the child is a member or eligible for

membership cannot be determined,

> notice of the child-custody proceeding must be sent to the appropriate [BIA] Regional Director (see www.bia.gov). To establish Tribal identity, as much information as is known regarding the child's direct lineal ancestors should be provided. The [BIA] will not make a determination

24

of Tribal membership but may, in some instances, be able to identify Tribes to contact.

*Id.* § 23.111(e). The notice must be easy to understand and include the following:

(1) The child's name, birthdate, and birthplace;

(2) All names known (including maiden, married, and former names or aliases) of the parents, the parents' birthdates and birthplaces, and Tribal enrollment numbers if known;

(3) If known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents;

(4) The name of each Indian Tribe in which the child is a member (or may be eligible for membership if a biological parent is a member);

(5) A copy of the petition, complaint, or other document by which the child-custody proceeding was initiated and, if a hearing has been scheduled, information on the date, time, and location of the hearing;

(6) Statements setting out:

(i) The name of the petitioner and the name and address of petitioner's attorney;

(ii) The right of any parent or Indian custodian of the child, if not already a party to the child-custody proceeding, to intervene in the proceedings.

(iii) The Indian Tribe's right to intervene at any time in a State-court proceeding for the foster-care placement of or termination of parental rights to an Indian child.

(iv) That, if the child's parent or Indian custodian is unable to afford counsel based on a determination of indigency by the court, the parent or Indian custodian has the right to court-appointed counsel.

(v) The right to be granted, upon request, up to 20 additional days to prepare for the child-custody proceedings.

(vi) The right of the parent or Indian custodian and the Indian child's Tribe to petition the court for transfer of the foster-care-placement or termination-of-parental-rights proceeding to Tribal court as provided by 25 U.S.C. 1911 and § 23.115.

(vii) The mailing addresses and telephone numbers of the court and information related to all parties to the child-custody proceeding and individuals notified under this section.

(viii) The potential legal consequences of the child-custody proceedings on the future parental and custodial rights of the parent or Indian custodian.

(ix) That all parties notified must keep confidential the information contained in the notice and the notice should not be handled by anyone not needing the information to exercise rights under ICWA.

*Id.* § 23.111(d). Regulation 23.107 provides that when a trial court has reason to know that a child is an Indian child but does not have enough evidence to determine whether the child is or is not an Indian child, the trial court must:

(1) Confirm, by way of a report, declaration, or testimony included in the record that the agency or other party used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member (or a biological parent is a member and the child is eligible for membership); and

(2) Treat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an "Indian child" in this part.

*Id.* § 23.107(b).

Because the termination of Mother's and Father's rights will likely result in Adam's adoption by his current placement, strict compliance with the notice provisions of ICWA is required. *See In re T.R.*, 491 S.W.3d 847, 851 (Tex. App.—San

26

Antonio 2016, no pet.); *R.R.*, 294 S.W.3d at 224–25. Substantial compliance with the notice provisions is not enough. *R.R.*, 294 S.W.3d at 224. DFPS concedes that its notice did not strictly comply with ICWA because "it did not contain all of the familial information required of the code and the return receipt was not filed or made part of the record as required." We agree that the notice did not strictly comply with the ICWA notice provisions. *See* 25 C.F.R. § 23.111(a)(2), (d). We do not determine whether DFPS's notice was deficient in other ways. *See* Tex. R. App. P. 47.1.

DFPS argues that if we hold its notice insufficient, as we have, we should conditionally affirm the trial court's judgment and abate this case to the trial court to allow for proper notice. Mother responds in her reply brief that DFPS judicially admitted that Adam is an Indian child under ICWA and that the proper remedy is to reverse and remand. A judicial admission is "a clear, deliberate, and unequivocal statement" that "conclusively establish[es]" a fact and bars the party who made it from challenging it. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) (citation omitted); *In re P.K.*, 560 S.W.3d 413, 421 (Tex. App.—Fort Worth 2018, pet. denied). DFPS's statement that Adam "is believed to be a member of or eligible for membership in a federally recognized Indian tribe[] or . . . is an 'Indian child'" is not a judicial admission; DFPS did not *unequivocally* state that Adam is an Indian child. *See P.K.*, 560 S.W.3d at 421. We therefore sustain Mother's second issue but agree with DFPS's alternate argument that the proper remedy is to conditionally affirm, abate, and remand.

27

If the trial court determines after ICWA notice provisions are strictly complied with that Adam is not an Indian child and ensures that we receive a supplemental record documenting that notice and determination by Wednesday, November 6, 2019, we will issue a judgment affirming the trial court's judgment. Otherwise, we will reverse. *See* 25 C.F.R. § 23.107(b)(2); Tex. R. Jud. Admin. 6.2(a); Tex. R. App. P. 43.2(d). Because of our disposition of this issue, we do not reach Mother's third and fourth issues complaining of other ICWA violations. *See* Tex. R. App. 47.1.

## V. CONCLUSION

Having held that the trial court had subject matter jurisdiction to extend the case's dismissal deadline, that Mother failed to preserve her complaints that the trial court abused its discretion by extending the deadline and that DFPS violated the family code and did not employ fundamentally fair procedures in working with her, that the evidence is factually sufficient to support the trial court's best-interest finding, and that ICWA's notice provisions were not strictly complied with, we conditionally affirm the trial court's judgment.

Because the record does not show that ICWA's notice procedures were strictly complied with, we abate the appeal and remand the case to the trial court. The trial court shall ensure that proper notice is provided as required by ICWA, and after such notice, the trial court shall conduct a hearing and determine whether Adam is or is not an Indian child under ICWA. By Wednesday, November 6, 2019, the trial court shall transmit to this court a supplemental reporter's record of the hearing and a

28

supplemental clerk's record containing the trial court's written findings, a copy of the ICWA-compliant notice, any return receipts, and any other supporting documentation. We will not entertain requests to extend this deadline. *See* Tex. R. Jud. Admin. 6.2(a).

If we receive a supplemental record by Wednesday, November 6, 2019, that contains proof of an ICWA-compliant notice and the trial court's determination that Adam is not an Indian child, we will issue a judgment affirming the trial court's judgment. Otherwise, we will render judgment reversing the trial court's judgment and directing the trial court to conduct a new trial applying ICWA. *See* 25 C.F.R. § 23.107(b)(2); Tex. R. Jud. Admin. 6.2(a); Tex. R. App. P. 43.2(d).

/s/ Lee Gabriel
Lee Gabriel
Justice

Delivered: October 1, 2019

29